Filed 2/1/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| W.S.,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>S.T.,<br><br>    Defendant and Respondent. | H042611<br>(Santa Clara County<br>Super. Ct. No. 1-14-CP021742) |

In 2014, appellant W.S. filed a petition to establish a parental relationship with his daughter (daughter). W.S. alleged he was daughter's biological father. He claimed he had a relationship with S.T., daughter's mother, while she was married to her husband, Martin T. W.S. requested joint legal and physical custody, equal time visitation, and mediation to work out a parenting plan. He also requested daughter's last name be changed. The trial court denied W.S.'s requests, finding he was not a presumed parent within the meaning of Family Code section 7611, subdivision (d).[1]

On appeal, W.S. argues the trial court applied an incorrect legal standard when it found he was not a presumed parent under section 7611, subdivision (d). Furthermore, he claims the court failed to exercise its discretion to order him visitation as an interested party. He also argues California's statutory scheme is unconstitutional, violating the principles of due process and equal protection. Lastly, he claims the trial court's decision on the matter may have been the result of bias. For the reasons set forth below, we affirm.

---

[1] Unspecified statutory references are to the Family Code.

BACKGROUND

1. *Statement of Facts*

    a. **Daughter's Birth**

In 2002, S.T. married Martin and had their son Frank. In 2006, S.T. and Martin separated for approximately 18 months. During their separation, they did not live together. S.T. filed for divorce from Martin in 2006. She met W.S. sometime in 2007 or 2008 while working at a car dealership. The two began a relationship. At the time, W.S. believed S.T. was divorced and lived with her mother.

In 2008, S.T. became pregnant with daughter. By that time, S.T. said she had reconciled with Martin and was living with him. She told W.S. he was not daughter's father, and W.S. did not press her for details. During S.T.'s pregnancy, Martin attended prenatal classes with her. He drove her to the hospital when she was in labor and took several weeks off work so he could help afterwards. Martin was in the room during daughter's birth and cut her umbilical cord. His name was put on daughter's birth certificate. According to Martin, S.T. breastfed daughter when she was a baby, and daughter would wake up every two hours. Martin helped S.T. take care of daughter. He changed daughter's diaper, washed her laundry, and rocked her to sleep. When daughter started drinking formula, Martin would prepare bottles for her. Daughter slept with S.T. and Martin in their bed until she was approximately four and a half years old.

Shortly after daughter's birth, S.T. suspected W.S. was daughter's father based on her features. Her suspicions were confirmed by a DNA test.[2] Martin remained unaware that daughter was not his biological daughter.

---

[2] W.S. and S.T. used a DNA testing kit purchased at a drugstore. The blood DNA test was not court-ordered.

S.T. believed W.S. first saw daughter several weeks after she was born. The visit was brief, lasting only several minutes. W.S. lived with his mother at the time, and he did not initially tell his mother that daughter was his daughter.

b. **W.S.'s Account of His Relationship with Daughter**

W.S., S.T., and Martin provided conflicting accounts of W.S.'s relationship with daughter. Between 2009 and 2010, W.S. said he saw daughter almost every day, and she spent the night at his apartment approximately once or twice a week. Daughter would often stay overnight by herself, because S.T. had to be at home to take care of Frank. W.S. believed S.T. and daughter lived with S.T.'s mother.

Daughter did not have her own room at W.S.'s apartment, which he shared with his mother. W.S. said his apartment was full of daughter's toys and artwork. He had purchased a crib for daughter, but she did not use it. Daughter slept in W.S.'s bed if she spent the night. W.S. made bottles for her if she woke up by putting a scoop of formula in a bottle with warm water. Daughter started eating solid foods between six and nine months. W.S. said S.T. would cut up cooked pieces of vegetables, like broccoli, to feed to daughter.

According to W.S., S.T. began limiting the amount of time daughter spent at his apartment as she got older and began attending daycare.[3] W.S. did not participate in activities at daycare, because S.T.'s mother knew people at the school. W.S. did not want to cause embarrassment for S.T., daughter, or Frank if people at the daycare found out that Martin was not daughter's father. Daughter did not spend the night at his apartment as often after she started daycare.

In 2013, daughter began attending preschool. She was enrolled using W.S.'s last name. W.S. paid for daughter's tuition for approximately a year, and he frequently

---

[3] W.S.'s friend testified at the hearing that he saw daughter at W.S.'s home only five or six times.

picked her up at the preschool. Daughter's teacher at preschool confirmed that W.S. and S.T. often picked daughter up at school together. Daughter would run to W.S. when he came to get her. W.S. participated in school activities and parent-teacher conferences. The teacher recalled that daughter called W.S. "Pa" or "Daddy." Daughter's teacher believed W.S. and S.T. were a couple in a "[n]ormal relationship." She could not recall seeing Martin at the school.

W.S. held birthday parties for daughter when she turned three, four, and five. W.S. and S.T. took daughter on trips, including a trip to Six Flags for her birthday. Daughter made drawings for W.S., including a drawing with a heart and the word "Pa." W.S. said the photo symbolized "Pa's heart." W.S. posted daughter's artwork around his apartment. He celebrated Valentine's Day, Christmas, Thanksgiving, and Halloween with daughter. W.S. had many nicknames for daughter.

W.S. did not know the name of daughter's dentist or doctor. He had never attended daughter's medical appointments, and daughter was not on his health insurance. However, he did pay for S.T.'s cell phone bill. He also occasionally gave S.T. money.

c. **S.T.'s Account of W.S.'s Relationship with Daughter**

According to S.T., W.S. exaggerated the closeness of his relationship with daughter. S.T. brought daughter to visit W.S. approximately once or twice a week during her first year.[4] However, she described daughter's typical visits with W.S. as brief. S.T. allowed daughter to stay overnight at W.S.'s home only once when she was an infant. S.T. found being separated from daughter too painful to allow more overnight visits.

S.T. refuted W.S.'s claims about daughter's feeding. S.T. said daughter was breastfed for the first few months. S.T. insisted she would not have permitted daughter to drink bottles made with warm water that was not boiled first, as described by W.S.

---

[4] A friend who coordinated pickups with S.T. confirmed that she picked daughter up at W.S.'s home once or twice a week.

4

She also explained that daughter started eating solid foods between one and two years of age, not between six and nine months. Daughter began eating purees, not diced vegetables.

When daughter started daycare, S.T. would occasionally take her to visit W.S. The visits were short, lasting maybe one or two hours. Daughter spent weekends at home with S.T., Martin, and Frank. When daughter was enrolled at preschool, S.T. allowed W.S. to pay for half of daughter's tuition. S.T. deposited money into W.S.'s bank account to pay for the other half of the tuition. She acknowledged that W.S. frequently went with her to pick up and drop off daughter at the school. Occasionally, daughter went to W.S.'s apartment to play after preschool ended.

S.T. could only remember daughter staying overnight at W.S.'s apartment a total of three or four times. W.S., however, had text messages that seemed to indicate daughter stayed overnight with him at least 10 or more times. When questioned about the messages, S.T. said she could not recall sending the messages and could not remember daughter spending the night so frequently. S.T. described her relationship with W.S. as "verbally abusive." She also claimed she was often present when daughter visited W.S. W.S. would hide daughter's toys when she was not there, because not all of his relatives knew daughter was his daughter.

On daughter's birthdays, S.T. would take daughter to W.S.'s house in the morning. She also brought daughter to W.S.'s house if he had presents for her on Christmas. On Halloween, she would bring daughter over for trick or treating. S.T. acknowledged she had gone on trips with daughter, W.S., and W.S.'s mother. They had visited the Jelly Belly factory for daughter's second birthday. S.T., W.S., and daughter had also gone to Six Flags for daughter's fourth birthday.

d. **Martin's Relationship with Daughter**

Martin could only recall a few occasions where daughter was not home at night. He did not believe daughter could have spent so many nights at W.S.'s apartment, because he would have noticed she was not at home. Martin described that as daughter got older, he continued to be very involved in her life. He cleaned up for her, cooked for her, and used to pick her up at daycare. When it was time for daughter to sleep, Martin would put her to bed by either reading to her or putting on a movie.

Martin could not recall the name of daughter's preschool. He did not pick her up or drop her off at preschool and did not participate in any of the school activities. He believed S.T. was the one paying for the preschool.

Daughter was on Martin's health insurance. Martin scheduled daughter's dentist appointments and knew the name of daughter's doctor. Martin did not attend her appointments.

e. **End of W.S. and S.T.'s Relationship**

S.T. described her relationship with W.S. as tumultuous. She said they "ended" their relationship numerous times throughout the years. In July 2014, S.T. told Martin about her relationship with W.S. Martin was upset and initiated divorce proceedings. However, by the time W.S. filed his petition to establish a parental relationship, Martin and S.T. were in the process of reconciling. Martin and S.T. said they were working on their marriage and were not proceeding further with the divorce.

2. *Petition to Establish Parental Relationship*

On August 22, 2014, W.S. filed a petition to establish a parental relationship with daughter. W.S. alleged he was daughter's biological father and requested joint legal and physical custody and equal visitation. W.S. also requested daughter's last name be changed.

6

On August 25, 2014, S.T. filed a response asserting that daughter was not W.S.'s daughter. S.T. declared that she had a relationship with W.S. before she became pregnant with daughter. Daughter, however, was born during her marriage to Martin while they were living together. Thus, Martin was daughter's father. On August 26, 2014, Martin moved for joinder. Martin argued that he was a necessary party to the action, since there was a conclusive presumption he was daughter's father under section 7540.

Before the hearing, all parties submitted briefs, arguments, and evidence for the trial court to consider. W.S. argued the presumption of paternity under section 7540 should not apply to Martin, because S.T. had filed for divorce from Martin in 2006. Thus, he claimed that S.T. and Martin were not cohabitating at the time daughter was conceived. W.S., however, conceded that even if Martin was not a conclusive father under section 7540, he met the requirements of a presumed father under section 7611. W.S. argued he also met the requirements of a presumed father under section 7611. He then argued his presumption of fatherhood should prevail over Martin's presumption under section 7612, subdivision (b), which provides that when two competing presumptions for paternity exists the presumption upon "which on the facts is founded on the weightier considerations of policy and logic controls."

S.T. filed a declaration asserting that she was cohabitating with Martin at the time daughter was conceived. She also filed a brief claiming the marital presumption of paternity under section 7540 has precedence over the presumption set forth under section 7611.

3. *The Hearing and Trial*

On October 21, 2014, the trial court held a hearing and found there was a conclusive presumption that Martin was daughter's father, because he was married to and cohabitating with S.T. when daughter was conceived pursuant to section 7540. Thereafter, it found Martin was a necessary party to the action and granted his motion for

7

joinder. Subsequently, the trial court continued the hearing, focusing on whether W.S. was presumptively daughter's father under section 7611.[5]

The court heard testimony from W.S., S.T., Martin, and several family members and friends. After hearing argument from the parties, the court took the matter under submission. On March 19, 2015, the trial court issued a written statement of decision denying W.S.'s request for visitation and joint legal and physical custody of daughter. The trial court concluded W.S. had not received daughter into his home, because he had not satisfied the standard of " 'regular visitation,' " which included "assumption of parent-type obligations and duties . . . ." Thus, he could not qualify as a presumed parent within the meaning of section 7611, subdivision (d).

## DISCUSSION

On appeal, W.S. argues the trial court erred when it denied his request to establish a parental relationship. He argues (1) the trial court applied an incorrect legal standard to determine if he received daughter into his home under section 7611, subdivision (d), (2) the trial court erred when it failed to grant him visitation with daughter, (3) the trial court's decision erroneously considered the timeliness of his petition when there is no statute of limitations to bring an action to establish a parental relationship, (4) California's statutory scheme is unconstitutional, because it deprives him of due process and explicitly prefers mothers over fathers and requires fathers to take affirmative steps before recognizing their equal right to custody, and (5) a reasonable person may entertain doubts as to whether the trial court's decision on his petition was the result of bias. For the reasons set forth below, we affirm.

---

[5] The first day of the trial was held on October 21, 2014. The trial continued on to December 9 and 15, 2014.

8

1. *Receipt into the Home*

On appeal, W.S. argues the trial court misinterpreted the receiving requirement set forth under section 7611, subdivision (d). Section 7611, subdivision (d) provides that a person is a presumed parent if he or she "receives the child into his or her home and openly holds out the child as his or her natural child."[6] The statute does not expressly define what actions constitute receiving a child into a home. In its statement of decision, the trial court expressed the view that receiving daughter into his home required W.S. to prove regular visitation and the assumption of parent-type obligations and duties such as feeding, bathing, putting daughter to bed, changing her clothes, disciplining her, and other similar tasks. W.S. argues section 7611, subdivision (d) only required him to physically take daughter inside his home, and the trial court's additional requirements were superfluous and not within the meaning of the statute. As we explain below, we reject W.S.'s claim.

a. **Overview and Standard of Review**

W.S. questions the trial court's interpretation of section 7611, subdivision (d). The interpretation of a statute is a question of law, which we review de novo. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432.)

When construing a statute, we ascertain the Legislature's intent in order to carry out the purpose of the law. (*Cummins, Inc. v. Superior Court* (2005) 36 Cal.4th 478, 487.) We first examine the language of the statute. If the language is not ambiguous, "we presume the Legislature meant what it said, and the plain meaning of the statute governs." (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 1000.) However, "if the statutory language permits more than one reasonable interpretation, courts may consider

---

[6] The parties did not dispute that W.S. held daughter out as his own child. They only disputed whether W.S. received daughter into his home within the meaning of section 7611, subdivision (d).

various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute. [Citation.]  In the end, we ' "must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." ' " (*Torres v. Parkhouse Tire Service*, *Inc*. (2001) 26 Cal.4th 995, 1003.)

b. **"Receiving" Requirement**

W.S. argues the receiving requirement set forth under section 7611, subdivision (d) is satisfied by a parent physically taking a child into his or her home. Thus, he argues the trial court erred when it concluded he did not receive daughter into his home.  For the reasons set forth below, we disagree.

The Uniform Parentage Act (§ 7600 et seq.) (UPA) distinguishes presumed fathers from biological and alleged fathers.  (*In re J.L.* (2008) 159 Cal.App.4th 1010, 1018.) Biology is not determinative of presumed fatherhood.  (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1209 (*T.R.*).)  Mothers and *presumed* fathers have far greater rights.  (*Adoption of Kelsey S*. (1992) 1 Cal.4th 816, 824 (*Kelsey S*.).)  A father is not elevated to presumed father status unless he has demonstrated a "commitment to the child and the child's welfare . . . regardless of whether he is biologically the father."  (*T.R.*, *supra*, at p. 1212.)

Section 7611 sets forth several rebuttable presumptions of paternity.  " 'The statutory purpose [of section 7611] is to distinguish between those fathers who have entered into some familial relationship with the mother and child and those who have not.' " (*T.R.*, *supra*, 132 Cal.App.4th at p. 1209.)  Section 7611, subdivision (d) creates a rebuttable presumption of presumed fatherhood if "[t]he presumed parent receives the child into his or her home and openly holds out the child as his or her natural child."

Section 7611, subdivision (d) does not provide an express definition of what constitutes receipt of a child into a parent's home.  However, several courts have

10

analyzed the roots of the "receiving" element. In *Charisma R. v. Kristina S.* (2009) 175 Cal.App.4th 361, 369 (*Charisma R.*), disapproved on another point in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 532, the court noted "receives" as used in section 7611, subdivision (d), came from former Civil Code section 230, which pre-dated the UPA and codified the concept of legitimacy. (*Charisma R.*, *supra*, at p. 371.) At that time, former Civil Code section 230 provided: "The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth." (Former Civ. Code, § 230, repealed by Stats. 1975, ch. 1244, § 8, p. 3196.) In 1975, the Legislature enacted the UPA, which abolished the concept of legitimacy or illegitimacy and replaced it with the concept of parentage. (*Kelsey S.*, *supra*, 1 Cal.4th at p. 828.) Former Civil Code section 230 was replaced by section 7611, subdivision (d). (*Kelsey S.*, *supra*, at pp. 827-828; *Charisma R.*, *supra*, at p. 371.)

Prior to the enactment of the UPA, courts liberally interpreted what constituted "receipt" into the home. (*In re Richard M.* (1975) 14 Cal.3d 783, 794.) In *Richard M.*, the Supreme Court concluded "[the] requirement [was] satisfied by evidence that the father accepted the child as his own, usually demonstrated by an actual physical acceptance of the child into the father's home to the extent possible under the particular circumstances of the case. Thus the father receive[d] the child into his family when he temporarily reside[d] with the mother and child, even for a brief period." (*Ibid.*) "The statutory receipt requirement [was] also fulfilled by the father's acceptance of the child into his home for occasional temporary visits." (*Id.* at p. 795.) Additionally, in *Estate of Peterson* (1963) 214 Cal.App.2d 258, the court found the father received the daughter into his home when she visited briefly once and spent two weekends at the home of the father and his wife. (*Id.* at pp. 263-264.)

11

W.S. correctly asserts that there is no requirement that a child live with a parent for the parent to achieve presumed parent status. (See *In re A.A.* (2003) 114 Cal.App.4th 771, 784 (*A.A.*) [finding presumed father status when child never lived with presumed father].) W.S., however, broadly interprets section 7611, subdivision (d) to require only that daughter was physically present inside his home. W.S. relies on cases like *Richard M.* and *Peterson* and their liberal interpretation of the receiving requirement to support this claim. However, a review of cases analyzing the receiving requirement post-UPA compels us to reject his argument. "Section 7611, subdivision (d) . . . requires something more than a man's being the mother's casual friend or long-term boyfriend; he must be 'someone who has entered into a familial relationship with the child: someone who has demonstrated an abiding commitment to the child and the child's well-being' regardless of his relationship with the mother." (*In re D.M.* (2012) 210 Cal.App.4th 541, 553.) In other words, the child's physical presence within the alleged father's home is, by itself, insufficient under section 7611, subdivision (d).

In *Kelsey S.*, our Supreme Court acknowledged that historically under cases like *Richard M.*, there was a liberal interpretation of the receiving requirement, and even constructive receipt was potentially sufficient. (*Kelsey S.*, *supra*, 1 Cal.4th at p. 828.) However, cases pre-dating the UPA like *Richard M.* were decided in a much different statutory context. When *Richard M.* was decided, "the determination was whether the child had been *legitimated* by the father." (*Ibid.*, italics added.) There was stigma and unfavorable legal treatment attached to a classification of a child as illegitimate. (*Ibid.*) An illegitimate child had no legal father. In contrast, after the enactment of the UPA and the replacement of the concept of legitimacy with parentage, children *will* end up with a father, whether it be a biological father that is granted presumed father status or an adoptive father. (*Id.* at pp. 828-829.) Thus, *Kelsey S.* held that the child must be

12

physically received into the home, and constructive receipt is insufficient. (*Id*. at pp. 826-830.)

Following *Kelsey S*., courts have found that the receiving requirement was met if the "receipt of the child into the home [was] sufficiently unambiguous as to constitute a clear declaration regarding the nature of the relationship . . . ." (*Charisma R*., *supra*, 175 Cal.App.4th at p. 374.) A father does not need to receive the child into his home for a specific period of time, although cohabitation for an extended period of time may strengthen a claim for presumed parent status. (*Ibid*.) However, to receive a child into his or her home, a parent *must* "demonstrate a parental relationship, however imperfect." (*Jason P*. *v*. *Danielle S*. (2017) 9 Cal.App.5th 1000, 1023 (*Jason P*.).) "Presumed parent status is afforded only to a person with a *fully developed parental relationship* with the child." (*R.M*. *v*. *T.A*. (2015) 233 Cal.App.4th 760, 776.)

There are no specific factors that a trial court must consider before it determines that a parent has "received" a child into the home and has established a parental relationship. "In determining whether a man has 'receiv[ed a] child into his home and openly h[eld] out the child' as his own [citation], courts have looked to such factors as whether the man actively helped the mother in prenatal care; whether he paid pregnancy and birth expenses commensurate with his ability to do so; whether he promptly took legal action to obtain custody of the child; whether he sought to have his name placed on the birth certificate; whether and how long he cared for the child; whether there is unequivocal evidence that he had acknowledged the child; the number of people to whom he had acknowledged the child; whether he provided for the child after it no longer resided with him; whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and whether his care was merely incidental." (*T.R*., *supra*, 132 Cal.App.4th at p. 1211.)

13

In *Charisma R.*, the appellate court found substantial evidence supported the presumed parent finding when the parent attended the birth of the child, shared parenting responsibilities for the first six weeks of the child's life, cared for the child full time for the following seven weeks, and held herself out as the child's mother in various ways. (*Charisma R.*, *supra*, 175 Cal.App.4th at pp. 374-375.)

In *Jason P.*, the appellate court upheld the trial court's conclusion that the father had sufficiently "received" his son at his apartment in New York, noting that the child spent time at the father's apartment in New York, the father made arrangements with his assistant to accommodate the child while he was there, he took the child to the park when he was not working, he fed, played music for, and read to the child, he arranged for an allergist to see the child, he obtained a baby gate for the child to prevent him from falling down the stairs in his apartment, and he gave the child his own room in the apartment. (*Jason P.*, *supra*, 9 Cal.App.5th at p. 1022.) These acts "unambiguously demonstrated a parental relationship" between father and child during his visits to his father's New York apartment. (*Id*. at p. 1023.)

In *S.Y. v. S.B.* (2011) 201 Cal.App.4th 1023, the appellate court held there was substantial evidence that a mother in a same-sex relationship had received their children into her home. (*Id*. at p. 1032.) While in a relationship with her former partner, the mother maintained a separate residence but regularly spent three or four nights a week at her former partner's home and helped take care of their first child. She also stopped by after work to see the child and assisted in his care. (*Ibid*.) When the second child was born, the mother was no longer in a relationship with her former partner. However, she continued to go to her former partner's home on weekdays and weeknights to spend time with and take care of both children. (*Ibid*.) When the parties reconciled, the mother resumed spending three or four nights a week at her former partner's home, assisting with the children's care. (*Ibid*.)

14

In its statement of decision, the trial court relied on *A.A.*, *supra*, 114 Cal.App.4th 771. In *A.A.*, the appellate court found there was insufficient evidence the child was received into the respondent's home within the meaning of section 7611, subdivision (d). (*A.A.*, *supra*, at pp. 786-787.) The respondent (biological father) asserted he visited the child " 'on a fairly regular basis' " during the first year of her life and visited the child every other weekend for the next three years. (*Id*. at p. 786.) The visits did not take place in the respondent's home. Absent an explanation for not having the visits take place in his home, the court concluded "such visitation can be seen as a matter of convenience for respondent." (*Ibid*.) Visiting the child at other homes allowed the respondent to "avoid the constant parental-type tasks that come with having the child in his own home—such as feeding and cleaning up after the minor, changing her clothing, bathing her, seeing to her naps, putting her to bed, taking her for outings, playing games with her, disciplining her, and otherwise focusing on the child." (*Id*. at pp. 786-787.) In fact, there was no indication of what the respondent did with the child during her visits. (*Id*. at p. 787.)

In contrast, the *A.A.* court found there was sufficient evidence the appellant (not the biological father) met the requirements to achieve presumed father status under section 7611, subdivision (d). (*A.A.*, *supra*, 114 Cal.App.4th at p. 784.) Although the child did not live with appellant on a full-time basis, he was regularly involved with the child since her birth. (*Ibid*.) The appellant also provided financial support for the child, buying her clothes, toys and food, and other essentials. (*Ibid*.)

The trial court also relied on *In re Cheyenne B*. (2012) 203 Cal.App.4th 1361, 1369 (*Cheyenne B*.). In *Cheyenne B*., the father was incarcerated when the child was born and sporadically visited her several times. (*Ibid*.) Sometimes he would meet her at a local Wal-Mart when he drove through the town where she lived. (*Ibid*.) The appellate court concluded substantial evidence supported the trial court's determination that the

father's visits with the child were too inconsistent and irregular to satisfy the requirement that he received the child into his home. (*Id*. at p. 1380.)

*Cheyenne B*. characterized *A.A*. as requiring "regular visitation" in order to satisfy receipt under section 7611, subdivision (d). (*Cheyenne B*., *supra*, 203 Cal.App.4th at p. 1379.) The trial court referenced this " 'regular visitation' " standard in its statement of decision, explaining that the receiving element could be satisfied by showing " 'regular visitation,' " which included "assumption of parent-type obligations and duties . . . ." This statement demonstrates the trial court understood that to become a presumed parent, one must show a *parental*, family-child relationship. (*R.M. v. T.A*., *supra*, 233 Cal.App.4th at p. 776.) We find this to be an accurate representation of the law. The common thread between the cases we have discussed is that the parent seeking presumed parent status could show the existence of a parent-child relationship based on assuming parental responsibilities, demonstrating commitment to the child, and providing support. That is the standard the trial court applied in W.S.'s case.

W.S. argues that cases like *A.A*. and *Cheyenne B*. limit their holdings to dependency proceedings. Principally, W.S. relies on *In re Jerry P*. (2002) 95 Cal.App.4th 793 (*Jerry P*.). The *Jerry P*. court explained that in dependency proceedings the purpose of section 7611, subdivision (d) is not to establish paternity but "to determine whether the alleged father has demonstrated a sufficient commitment to his parental responsibilities to be afforded rights *not* afforded to natural fathers—the rights to reunification services and custody of the child." (*Jerry P*., *supra*, at p. 804.) Thus, *Jerry P*. held that in the dependency context, the term " 'presumed father' does not denote a presumption of fatherhood in the evidentiary sense and presumed father status is not rebutted by evidence someone else is the natural father." (*Ibid*.)

Nothing in *Jerry P*. suggests that we must interpret section 7611, subdivision (d) differently depending upon whether it is applied in the dependency context or in some

16

other proceeding. As explained in *Jerry P.*, the purpose served by determining presumed parent status in a dependency proceeding is different than in a proceeding to determine a parental relationship. In a dependency proceeding, the presumed parent status entitles one to services not available to a natural parent who has not attained that status. However, it would make little sense to apply one definition of "receiving" as used in section 7611 to dependency actions while applying another definition to all other proceedings. Section 7611 should be subject to only one interpretation, regardless of the type of action in which it is used.

W.S. also argues the trial court impermissibly evaluated him using the factors set forth in *Kelsey S.*, *supra*, 1 Cal.4th 816. Under *Kelsey S.*, certain fathers may acquire the rights of a presumed father without meeting the requirements of any of the statutory presumptions, including the presumption set forth under section 7611. Under *Kelsey S.*, " 'an unwed biological father who comes forward at the first opportunity to assert his paternal rights after learning of his child's existence, but has been prevented from becoming a statutorily presumed father under section 7611 by the unilateral conduct of the child's mother or a third party's interference' acquires a status 'equivalent to presumed parent status under section 7611.' " (*In re D.A.* (2012) 204 Cal.App.4th 811, 824.) *Kelsey S.* held that a father who promptly steps forward and assumes parental responsibilities cannot have his parental rights terminated absent a showing of his unfitness as a parent even if he does not meet the statutory requirements of section 7611. (*Kelsey S.*, *supra*, at p. 849.)

There is some overlap in the factors used to determine whether a man is a presumed father under section 7611 and whether he is a father within the meaning of *Kelsey S.* (See *In re Elijah V.* (2005) 127 Cal.App.4th 576, 582.) The trial court's consideration of certain factors that are also relevant to the *Kelsey S.* analysis does not demonstrate a misunderstanding of the receiving element under section 7611. As we

17

have explained, a father "receives" the child into his home if he unambiguously demonstrates a parental relationship. (*Charisma R.*, *supra*, 175 Cal.App.4th at p. 374; *Jason P.*, *supra*, 9 Cal.App.5th at p. 1023.) Demonstrating a parental relationship requires W.S. prove more than the fact that daughter has been inside his home. Thus, the trial court correctly considered whether W.S. assumed parental responsibilities and took on the role of a parent in daughter's life.[7]

## 2. *Visitation Rights*

Next, W.S. argues that as daughter's biological father, he has a right to visitation under section 3100. He insists the provision regarding visitation found in section 3100 operates notwithstanding his failure to achieve status as a presumed parent. Alternatively, he claims that even if he was not a presumed parent, the court had the discretion to grant visitation rights to nonparents, and it failed to exercise this discretion.

First, we find that section 3100 is inapplicable in the context of this case. Section 3100, subdivision (a) begins by specifying that it applies when the court makes "an order pursuant to Chapter 4 (commencing with Section 3080)" of the Family Code, which discusses joint custody orders. (§ 3100, subd. (a).) Here, W.S. requested joint custody of daughter. However, since he failed to establish parentage under the UPA, the court did *not* make any joint custody orders. Thus, it did not make "an order pursuant to Chapter 4" of the Family Code, and section 3100's provisions providing for visitation (both for parents and for interested parties) are inapplicable here. (See *Ed H. v. Ashley C.* (2017) 14 Cal.App.5th 899, 912 ["section 3100 applies only when a joint custody order is

---

[7] In addition to addressing W.S.'s arguments, S.T. argues in her respondent's brief that sufficient evidence supported the trial court's conclusion that W.S. did not achieve presumed parent status. We decline to address this argument. W.S. did not raise this claim in his opening brief. Issues not raised in the appellant's opening brief are deemed waived or abandoned. (*Aptos Council v. County of Santa Cruz* (2017) 10 Cal.App.5th 266, 296, fn. 7.)

involved"].)  Accordingly, the trial court did not err when it did not order visitation for W.S., either as a parent or as an interested non-parent.

Second, W.S.'s argument that section 3100's provision providing for parental visitation applies to him fails as a matter of law.  W.S. argues that a "parent" under section 3100 is not limited to presumptive parents as defined under the UPA.  W.S.'s claim is a question of law that we review de novo.  (*People ex rel. Lockyer v. Shamrock Foods Co.*, *supra*, 24 Cal.4th at p. 432.)

"Division 8, part 2 of the Family Code governs the right to custody of a minor child.  Part 2 applies not only to dissolution, nullity and legal separation proceedings and actions for exclusive custody, but also to proceedings to determine custody or visitation in actions brought under the . . . UPA.  (§ 3021, added by Stats. 1993, ch. 219, § 116.11.) The Law Revision Commission comments to this section are particularly pertinent:  'This section expands the application of this part to proceedings in which custody or visitation is determined in an action pursuant to . . . the [UPA]. . . .' " (*Barkaloff v. Woodward* (1996) 47 Cal.App.4th 393, 397-398.)  Section 3100, subdivision (a), which is found in division 8, part 2 of the Family Code, provides in pertinent part:  "In making an order pursuant to Chapter 4 (commencing with Section 3080), the court shall grant reasonable visitation rights to a parent unless it is shown that the visitation would be detrimental to the best interest of the child."

Section 3100 does not expressly define the term "parent."  W.S., however, brought an action under the UPA to determine the existence of a *parental* relationship.  The UPA determines parentage—the "parent and child relationship"—as "the legal relationship existing between a child and the child's *natural* or adoptive parents . . . .  The term includes the mother and child relationship and the father and child relationship."  (§ 7601, subd. (b), italics added.)  The UPA further provides that the "parent and child relationship may be established as follows: (a) Between a child and the *natural* parent, it may be

19

established by proof of having given birth to the child, or under this part." (§ 7610, subd. (a), italics added.) This "part" includes section 7611. As we have previously discussed, section 7611, subdivision (d) provides that a person is a presumed parent if he or she "receives the child into his or her home and openly holds out the child as his or her natural child."

Thus, one way for W.S. to establish he is a natural parent under the UPA is to prove he meets the statutory elements of the presumption set forth under section 7611, subdivision (d). Here the trial court found W.S. did not meet the elements of the presumption. In other words, although W.S. is daughter's *biological* father, he is not a "natural parent" as defined under the UPA. Therefore, he does not have a parent-child relationship with daughter, and the trial court did not err by declining to award him visitation under section 3100 as a "parent."

Lastly, we find W.S.'s reliance on *Camacho v. Camacho* (1985) 173 Cal.App.3d 214 to be unavailing. He argues *Camacho* held that a biological father has a right to visitation. *Camacho* does not aid W.S. The father in *Camacho* filed a suit to establish paternity and obtain visitation, and the trial court adjudicated him the child's *natural* father. (*Id*. at p. 217.) Unlike the father in *Camacho*, W.S. was unsuccessful in establishing parentage.

3. *Constitutionality of the Statutory Scheme*

W.S. raises several constitutional challenges to the statutory scheme of the UPA and the Family Code. He argues he has a liberty interest, protected as a matter of substantive due process, in his relationship with daughter. He also argues section 3010 violates equal protection principles, because it automatically grants custody to biological mothers while requiring fathers to establish "presumed" parenthood under section 7611. He argues California law further divides fathers into various subclasses based on their marital status, readily granting married fathers presumed parenthood status while

20

requiring unmarried fathers to additionally prove receipt of the child into the home and acknowledgement of the child as his own.

Preliminarily, we find W.S.'s constitutional arguments are waived for failure to raise them to the trial court. " ' "Typically, constitutional issues not raised in earlier civil proceedings are waived on appeal." ' " (*Neil S*. *v*. *Mary L*. (2011) 199 Cal.App.4th 240, 254 (*Neil S*.).) W.S. did not discuss these constitutional issues in either his trial brief or his original petition to establish a parental relationship.

Furthermore, even if we were to consider W.S.'s arguments as pure questions of law presented by undisputed facts, we would reject them. First, we find *Kelsey S*., *supra*, 1 Cal.4th 816 instructive on whether W.S. had a protected liberty interest in establishing a parental relationship with daughter and whether his rights were entitled to equal protection as to a mother's rights. The *Kelsey S*. court construed former section 7004, which has since been renumbered to section 7611. The court noted that an unwed father has a constitutional due process right to establish a parental relationship with his child only if he "promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise . . . ." (*Kelsey S*., *supra*, at p. 849.)

"A court should consider all factors relevant to that determination. The father's conduct both *before and after* the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate 'a willingness himself to assume full custody of the child—not merely to block adoption by others.' [Citation.] A court should also consider the father's public acknowledgment of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal

21

action to seek custody of the child."[8] (*Kelsey S*., *supra*, 1 Cal.4th at p. 849, fn. omitted.) Thus, the statutory presumption set forth in section 7611 violates due process and equal protection principles only if it is applied to an "unwed father who has sufficiently and timely demonstrated a full commitment to his parental responsibilities." (*Kelsey S*., *supra*, at p. 849.) "Absent such a showing, the child's well-being is presumptively best served by continuation of the father's parental relationship. Similarly, when the father has come forward to grasp his parental responsibilities, his parental rights are entitled to equal protection as those of the mother." (*In re Ariel H*. (1999) 73 Cal.App.4th 70, 73.)

Here the trial court expressly found that W.S. did not take prompt legal action to obtain custody, did not assist S.T. in prenatal care or pay for birth expenses, was not involved in daughter's healthcare, and did not give daughter parental-type care when she visited. In short, W.S. did not demonstrate a full commitment to his parental responsibilities. Absent such a demonstrated commitment, W.S. did not have a protected liberty interest in establishing a parental relationship with daughter and his parental rights were not entitled to equal protection as to those of a mother. (*Kelsey S*., *supra*, 1 Cal.4th at pp. 849-850; *In re Ariel H*., *supra*, 73 Cal.App.4th at pp. 72-74.)

Second, W.S.'s claim that the statute unconstitutionally prefers married fathers over unmarried fathers in violation of equal protection principles is undeveloped on appeal. " ' "The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." ' " (*Walgreen Co. v. City and County of San Francisco* (2010) 185 Cal.App.4th 424, 434.) "There is no constitutional requirement of uniform treatment. [Citations.] Legislative classification is permissible when made for a lawful state purpose and when the classification bears a rational relationship to that

_____

[8] We briefly discussed the *Kelsey S*. factors earlier in our opinion, when we evaluated W.S.'s claim that he qualified as a presumed parent under section 7611.

22

purpose.  [Citations.]  'Wide discretion is vested in the Legislature in making the classification and every presumption is in favor of the validity of the statute; the decision of the Legislature as to what is a sufficient distinction to warrant the classification will not be overthrown by the courts unless it is palpably arbitrary. . . .' "  (*Estate of Horman* (1971) 5 Cal.3d 62, 75.)  "When legislation involves a suspect classification such as classifications based on race, nationality or alienage, or the disparate treatment has a real and appreciable impact on a fundamental interest or right, a heightened standard of scrutiny is applied.  [Citations.]  In such cases, legislation will be upheld only if it is shown the state ' "has a *compelling* interest [that] justifies the law" ' and ' "that distinctions drawn by the law are *necessary* to further its purpose." ' "  (*Neil S.*, *supra*, 199 Cal.App.4th at p. 254.)

In his opening brief, W.S. does not explain how or why unmarried fathers and married fathers are similarly situated to each other.  Nor does he explain or make arguments pertaining to what level of scrutiny should apply if the two groups *are* similarly situated to each other.  Having failed to support his conclusory equal protection claim with reasoned legal analysis and citations to the law, we consider it waived.  (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

   4.  *Timeliness of W.S.'s Request to Establish a Parental Relationship*

W.S. argues the trial court erred when it determined his petition to establish a paternal relationship was untimely.  He argues the trial court's statement of decision is replete with references to his failure to take earlier legal action to establish his parental rights, which it should not have taken into consideration.

W.S. is correct that there is no statute of limitations for requesting custody or visitation of one's child.  Under section 7630, subdivision (b), "[a]ny interested party may bring an action at any time for the purpose of determining the existence or

23

nonexistence of the parent and child relationship presumed under subdivision (d) or (f) of section 7611."

W.S., however, is incorrect that the trial court found his request to be untimely. At no point did the trial court indicate in its statement of decision that it believed W.S.'s petition was barred by the statute of limitations. Rather, the trial court referenced the timeliness of his petition when it examined whether W.S. promptly stepped forward and assumed parental responsibilities, a factor it properly considered when considering if he achieved presumed parent status.[9] (*T.R.*, *supra*, 132 Cal.App.4th at p. 1211 [whether father promptly took legal action to obtain custody of child is a factor courts have considered when determining whether father received child into home].) The court's statements about W.S.'s timeliness did not demonstrate a misunderstanding of the law.

5. *Bias*

Lastly, W.S. argues the trial court's ruling on his petition raises doubts as to whether its decision was the product of bias. He argues bias can be inferred, because the trial court found S.T. to be credible despite her lack of candor during her testimony, in her trial briefs, and in her pleadings.

W.S.'s argument has no merit. "A party has the right to an objective decision maker and to a decision maker who appears to be fair and impartial." (*Wechsler v. Superior Court* (2014) 224 Cal.App.4th 384, 390.) As the trier of fact, the trial court must evaluate the credibility of witnesses and make determinations when conflicting evidence is presented. The trial court's "reliance on certain witnesses and rejection of others cannot be evidence of bias no matter how consistently the [trial court] rejects or doubts the testimony produced by one of the adversaries. . . . 'total rejection of an

---

[9] It is also a factor that is properly considered when determining if W.S. had a protected due process right to establish a relationship with daughter, as we previously discussed.

24

opposed view cannot by itself impugn the integrity or competence of a trier of fact.' "
(*Andrews v. Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 796.) We cannot
find prejudice merely because the trial court found some witnesses, such as S.T., to be
credible.

## DISPOSITION

The order is affirmed. S.T. is entitled to her costs on appeal.

25

_____

                                 Premo, Acting P.J.


WE CONCUR:



_____

Bamattre-Manoukian, J.




_____

Grover, J.




W.S. v. S.T.
H042611

| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. 1-14-CP021742 |
|---|---|
| Trial Judge: | Hon. Drew. C. Takaichi |
| Counsel for Appellant:<br>W.S. | Walzer Melcher<br>Edward M. Lyman |
| Counsel for Respondent:<br>S.T. | Dominion Law Group<br>Kevin S. Hutchinson |

W.S. v. S.T.
H042611