Filed 7/10/23  In re F.M. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re F.M., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br>v.<br>F.M.,<br>    Defendant and Appellant. | A166758, A167524<br><br>(Alameda County<br>Super. Ct. No. JD03470201) |

F.M., the alleged father of a now one-year-old boy, appeals the dispositional order declining to order reunification services for him and the subsequent order terminating his parental rights.  He has filed identical briefs in these two consolidated appeals, arguing the dependency court erred in not elevating him to presumed father status.

We affirm both orders.  The dependency court did not err in its parentage determination.

## BACKGROUND

These proceedings were commenced in April 2022, when Alameda County Social Services (the Agency) filed a dependency petition alleging the

1

baby, F.M., Jr., was at risk due to his mother's and F.M.'s homelessness, lack of suitable housing and untreated substance abuse; mother's mental health issues; and the previous termination of mother's parental rights concerning two older children due to her 14-year struggle with substance abuse and mental health issues.[1]

The baby was born prematurely, and he and his mother tested positive for amphetamines at his birth. His mother acknowledged using methamphetamine during the pregnancy and having a long history of methamphetamine addiction. The baby was detained while hospitalized in the neonatal intensive care unit, suffering from withdrawal symptoms.

A few days after the baby's birth, the social worker interviewed mother and F.M. at the hospital. Mother told the social worker F.M. is the baby's father, which both she and F.M. continued to maintain throughout these proceedings. F.M. told the social worker he and mother had been in a relationship for two years. Mother denied being homeless; but she also told the social worker she had received no prenatal care because she is homeless. Both mother and F.M. said they had been living together at the home of mother's ex-husband and the home of F.M.'s mother in Oakley, California. F.M. expressed an intent to live with mother and the baby at the home of mother's ex-husband upon the baby's discharge. Mother subsequently left the hospital against medical advice and showed up the next day at her ex-husband's house high on heroin.

When contacted, mother's ex-husband denied F.M. and mother had been living with him. He said the two are homeless and abuse substances.

---

[1] The minor shares the same initials as the alleged father. To avoid confusion, we refer to the minor as "baby" or "baby boy."

He was willing to allow mother and the baby to live with him, but not F.M., whom he did not know and did not want around his daughter.

F.M.'s sister-in-law was potentially open to being assessed for placement; F.M.'s brother declined to be assessed because he was unsure if F.M. is the baby's biological father. F.M.'s brother also denied that mother and F.M. had been living at their family's home in Oakley and said F.M. had not lived there for two years.

At the detention hearing held on April 13, 2022, neither mother nor F.M. were present. The dependency court appointed them counsel, granted them visitation and ordered the Agency to conduct a formal search for F.M.

The Agency located him about 10 days later and he attended the initial family team meeting (on May 3).

At a subsequent hearing (held on June 28), the dependency court advised counsel for the parties it had been unable to locate a voluntary declaration of paternity for F.M. in the state database search it had conducted, "[s]o at this point we do not have any proof or direction one way or the other as to whether or not [his] name is on the birth certificate."

By the time of the combined jurisdiction/disposition hearing held three months after the detention hearing, F.M. had attended just one visit (a few days before the hearing), his referral for substance abuse testing and treatment had been terminated because he had skipped all appointments and taken no steps to enroll, and the Agency had lost contact with him.

The combined jurisdiction/disposition hearing was held on July 25, 2022, and F.M. again did not attend, even though the social worker had previously reminded him of the hearing date. The petition's allegations (as amended) were found true and the baby was declared a dependent. The court bypassed reunification services for mother based on her prior child welfare

3

history. F.M.'s counsel proffered a declaration of paternity on his behalf signed only by her, not by F.M., and asked the court to elevate him to presumed father status based on it. At F.M.'s counsel's request, the court conducted a paternity inquiry of mother, who testified F.M. is the baby's biological father, supported her financially during the pregnancy, visited at the hospital and signed some paperwork there, which the hospital would not give her access to once the dependency case was underway. The court also re-checked the state database and again could not find any voluntary declaration of paternity on file for F.M., noting that often it takes only two months for them to get entered in the database whereas here it had been about three months since the baby's birth. The court declined to elevate F.M. to presumed father status in his absence and without proof of a signed declaration of paternity, and on that basis declined to order reunification services for him. The court scheduled a Welfare and Institutions Code section 366.26 hearing. F.M. then appealed the disposition order.

At a subsequent hearing on September 7, 2022, the court found the Agency had exercised due diligence in attempting to locate F.M., whose whereabouts were still unknown. The Agency believed he was living in a homeless encampment in East Oakland. On the morning of the hearing, however, his counsel notified the court he was presently in jail, with a hearing date in eight days.

By the time of the Welfare and Institutions Code section 366.26 hearing (held on November 21, 2022), F.M. had been released from custody, and his attorney had lost contact with him. His whereabouts remained unknown until the morning of the hearing, when it was discovered he had recently been arrested again (six days before the hearing) and was back in custody

4

facing new charges.[2]  There had been no further visits[3] and the hearing proceeded in his absence.  The court again declined to elevate F.M. to presumed father status and terminated his and mother's parental rights.  He then appealed those rulings too.[4]

## DISCUSSION

F.M. argues, first, that the dependency court erred in declining to deem him a presumed father under section 7611, subdivision (d).[5]  That provision "creates a rebuttable presumption of presumed fatherhood if '[t]he presumed parent receives the child into his or her home and openly holds out the child as his or her natural child.' " (*W.S. v. S.T.* (2018) 20 Cal.App.5th 132, 143 (*W.S.*), quoting § 7611, subd. (d).)

The inquiry is more qualitative than quantitative.  "A father does not need to receive the child into his home for a specific period of time, although cohabitation for an extended period of time may strengthen a claim for presumed parent status.  [Citation.]  However, to receive a child into his or her home, a parent *must* 'demonstrate a parental relationship, however

---

[2]  He had been served with notice of the hearing while in jail the prior month, and so had his counsel.

[3]  At the July 25, 2022 jurisdiction/disposition hearing, the court terminated father's visits because he had not been elevated to presumed father status ("He should not be visiting if he's an alleged father.  And really that is a bit of a problem").

[4]  The record does not contain a written order terminating parental rights or a minute order of the hearing.  No party argues this precludes our consideration of F.M.'s appeal.  We presume the law was followed and that the ruling was either entered into the minutes or a written order was prepared and entered.  (See Evid. Code, § 664; *In re I.V.* (2017) 11 Cal.App.5th 249, 258; Cal. Rules of Court, rule 8.104(c).)

[5]  All further statutory references are to the Family Code unless otherwise indicated.

imperfect.' [Citation.] 'Presumed parent status is afforded only to a person with a *fully developed parental relationship* with the child.' " (*W.S.*, *supra*, 20 Cal.App.5th at p. 145.) "It is not enough to demonstrate 'only a caretaking role and/or romantic involvement with a child's parent.' " [Citation.] Rather, the presumed parent must demonstrate ' "a full commitment to his [or her] paternal responsibilities—emotional, financial, and otherwise." ' " (*In re Alexander P.* (2016) 4 Cal.App.5th 475, 485.)

In assessing this issue, courts have looked to a number of factors, none dispositive. (*W.S.*, *supra*, 20 Cal.App.5th at p. 145.) As relevant here, they include factors such as " 'whether the man actively helped the mother in prenatal care; whether he paid pregnancy and birth expenses commensurate with his ability to do so; whether he promptly took legal action to obtain custody of the child; whether he sought to have his name placed on the birth certificate; whether and how long he cared for the child; whether there is unequivocal evidence that he had acknowledged the child; [and] the number of people to whom he had acknowledged the child . . . ." (*Id.* at pp. 145-146.) "While the juvenile [dependency] court may consider a wide range of factors in making a presumed parent determination, as appropriate to the circumstances [citation], the core issues are the person's established relationship with and demonstrated commitment to the child." (*In re Alexander P.*, *supra*, 4 Cal.App.5th at p. 485.)

"A person seeking presumed parent status has the burden of demonstrating compliance with the statutory requirements by a preponderance of the evidence." (*In re Alexander P.*, *supra,* 4 Cal.App.5th at p. 492.) Where a trial court has concluded that a party failed to meet its burden of proof, reversal is required only if the evidence compelled a finding in the party's favor on that issue as a matter of law. (*Sonic Manufacturing*

6

*Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466.) In such a case, " 'the inquiry on appeal is whether the weight and character of the evidence . . . was such that the [trial] court could not reasonably reject it.' " (*Trinity v. Life Ins. Co. of North America* (2022) 78 Cal.App.5th 1111, 1121, citing *In re R.V.* (2015) 61 Cal.4th 181, 201.) " 'We view the evidence in the light most favorable to the ruling, giving it the benefit of every reasonable inference and resolving all conflicts in support of the judgment. [Citation.] We defer to the trial court's credibility resolutions and do not reweigh the evidence.' " (*In re Alexander P.*, at p. 492.)

F.M. argues he established presumed father status under section 7611, subdivision (d), because both he and mother testified they had lived together and been in a romantic relationship for two years, they both reported that he was the baby's biological father, and he attended an initial family team meeting where he expressed a desire to be involved with the baby and wanted reunification services. He also points to mother's testimony that he told friends and family about the pregnancy, accompanied her to "a lot of" her medical appointments during her pregnancy, visited the baby at the hospital for three days, and signed some paperwork at the hospital that she couldn't recall and couldn't locate.

Such evidence does not establish presumed parentage as a matter of law, such that we must reverse. The dependency court was not required to believe mother's testimony about these subjects. (See *Hicks v. Reis* (1943) 21 Cal.2d 654, 659-660.) Indeed, it had good reason to doubt her credibility. For example, she testified F.M. accompanied her to "a lot" of her medical appointments, but at the hospital she told the social worker she had had no prenatal care. Further, the court sustained uncontested allegations that she had no prenatal appointments and was seen only three times during her

7

pregnancy in the emergency room. She had also told the social worker that she had lived with F.M. at the homes of two different relatives, but both of those relatives disputed those statements.

Moreover, there was considerable evidence that F.M. *lacked* a commitment to establishing a relationship with the baby and assuming the role of parent, none of which his brief discusses. We do not agree that he proved a demonstrated commitment to the newborn child as a matter of law, such that no factfinder could conclude otherwise. Although F.M. attended the initial family team meeting, he did not attend the second one. Nor did he avail himself of the substance abuse testing and treatment referral the Agency gave him. And despite multiple opportunities for visitation during the first three months of the case, he visited the baby only once. This record does not compel a determination as a matter of law that F.M. demonstrated " ' "a full commitment to his [or her] paternal responsibilities." ' " (*In re Alexander P., supra,* 4 Cal.App.5th at p. 485.) It suggests the opposite. The dependency court did not err in declining to elevate him to presumed father status under section 7611, subdivision (d).

F.M. also argues he put his name on the child's birth certificate and signed a voluntary declaration of paternity at the hospital.[6] But, as he

_____

[6] Although F.M. has not framed this point as an independent argument, we regard it as such. A genetic parent may acquire presumed parent status by executing a valid, voluntary declaration of paternity that is filed with the Department of Child Support Services. (See § 7573, subd. (d), incorporated by § 7611; *In re A.H.* (2022) 84 Cal.App.5th 340, 349, fn. 2; *M.M. v. D.V.* (2021) 66 Cal.App.5th 733, 742.) Doing so is an independent basis for establishing presumed parentage than pursuant to subdivision (d) of section 7611, by receiving the child into their home and openly holding them out as a natural child. (See § 7611 ["A person is presumed to be the natural parent of a child if the person meets the conditions provided in . . . Chapter 3

acknowledges, neither document could be found. At best, the evidence about the birth certificate and declaration of paternity was inconclusive, consisting only of his and mother's statements that he did these things. He cites no authority that mother's testimony alone and/or their statements to the social worker compelled the dependency court to find that these documents exist. On the contrary, "[i]f weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust" (Evid. Code, § 412); that is certainly true at least of the voluntary declaration of paternity. Nothing prevented F.M. from signing another one at any time during these proceedings, filing it with the appropriate child support agency and supplying it to the court. His counsel tried to do so on his behalf at the jurisdiction/disposition hearing three months into the case, but because F.M. was not present she could only proffer a paternity form he had not signed, which the dependency court rightly declined to credit. F.M. cites no authority that an unexecuted declaration of paternity is entitled to any legal force.

F.M. argues "[t]he fact that the juvenile [dependency] court and the social workers could not locate these documents does not disprove that [he] signed them." But he bore the burden of establishing his presumed parentage, and so it was his burden to prove that he did sign them, not the Agency's burden to prove that he didn't.[7] His statements to the social worker

_____

(commencing with Section 7570) of Part 2 or in any of the following subdivisions" including (d)].)

[7] At the detention hearing or as soon thereafter as possible, a dependency court must inquire at the hearing about the identity of all alleged or presumed fathers, which includes asking whether any man has signed a voluntary declaration of paternity. (Welf. & Inst. Code, § 316.2, subd. (a)(5).) In the present case the dependency court went farther and itself conducted a

9

and mother's vague testimony did not compel the dependency court to conclude that he had signed a voluntary declaration of paternity and/or was listed on the baby's birth certificate. Far from being conclusive proof of those facts, their statements suffered from credibility issues that were the trial court's exclusive province to assess. The dependency court did not err in insisting that F.M. himself attend the proceedings, attest to his paternity and/or sign or produce a copy of a validly executed voluntary declaration of paternity before the court would consider elevating him to presumed father status.

Finally, F.M. argues that because the baby was detained at birth, he was precluded from receiving the baby into his home and thereby achieving presumed parent status, and thus qualifies as a parent on non-statutory grounds under *Adoption of Kelsey S.* (1992) 1 Cal.4th 816. Extended discussion is unnecessary. To establish parentage under *Kelsey S.*, an alleged father must show that he has promptly attempted to assume his parental responsibilities as fully as the circumstances permit. (See *id.* at p. 849.) He must show he has "done all that he could reasonably do *under the circumstances,*" to demonstrate a "full commitment to his parental responsibilities," from the time he learned he was the biological father up to and including during the pending legal proceedings. (*Id.* at pp. 850, 849.)

records check, which yielded no evidence F.M. had signed a voluntary declaration of paternity. The court also must send a parentage inquiry to the local child support agency, on the mandatory Judicial Council Form (JV-500), asking whether parentage has been established through any superior court order or judgment or through the execution and filing of a voluntary declaration of paternity. (Cal. Rules of Court, rule 5.635(d)(2).) The record contains no such document. F.M. raises no issue about the adequacy of the dependency court's parentage inquiry, however, and we express no opinion on that subject.

For the reasons already explained, F.M. has not demonstrated this. Despite having been represented by appointed counsel, who definitively communicated with him about getting elevated to presumed father status, F.M. visited the baby just once, attended no court hearings, declined to participate in substance abuse testing and treatment, skipped a family team meeting and eventually could not even be located. (See, e.g., *In re D.S.* (2014) 230 Cal.App.4th 1238, 1245-1246 [error to accord *Kelsey S.* status to biological father who initially visited with baby and took prompt legal action to establish paternity but thereafter got "sidetracked" from establishing a parental bond by his own behavior including drug use and criminality].) "[A] father whose own bad decisions preclude him from carrying out his parental responsibilities does not satisfy the high bar set by *Kelsey S.*" (*In re D.S.,* at p. 1246.)

## DISPOSITION

The dispositional order and the order terminating parental rights are affirmed.

_____

STEWART, P.J.

We concur.


_____

RICHMAN, J.


_____

MILLER, J.


*In re F.M.* (A166758, A167524)