Filed 9/14/21  In re J.R. CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | H048689 (Santa Clara County Super. Ct. No. 20JD026505) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. A.R., Defendant and Appellant. | |

On July 7, 2020, the Santa Clara County Department of Family and Children's Services (Department) filed a petition (twice amended thereafter) under Welfare and Institutions Code section 300, subdivisions (b)(1) and (c) relative to an infant boy, J.R. (the minor), who was born in September 2019. The child's mother is A.R. (mother). There were two alleged fathers identified in the petition, D.R. and B.D.; neither of the individuals had been located. The Department alleged that the minor had been previously placed into protective custody because he was at substantial risk in the care of mother because of her chronic untreated substance abuse and her inability to protect the minor

from domestic violence perpetrated by her former boyfriend, V.A. Mother had advised the Department that V.A. was not the minor's father. On July 8, 2020, the court found that a prima facie showing had been made and that the continued detention of the minor with out-of-home placement was necessary.

On June 29,[1] three days before the minor was placed into protective custody, V.A. was arrested for domestic violence and kidnapping after an incident in which V.A. allegedly struck mother in the face (causing her temporary vision loss), and then took the minor. On that day, V.A. twice denied he was the minor's father: (1) he introduced himself to an emergency response social worker as mother's cousin, said he was not related to the minor, and that B.D. was the child's father; and (2) he told the police that he was not the minor's father. But in an interview three weeks later, V.A. told the Department that he was the minor's father as he supported him and loved him like a son; V.A. said he wanted to be part of the child's life. He stated he was willing to take a paternity test even though he was not in a relationship with mother. In September, the juvenile court ordered DNA testing of V.A. and the minor. On October 27, the court made a provisional finding that V.A. was the presumed father of the minor under Family Code section 7611, subdivision (d) (§ 7611(d)).[2]

On December 2, the juvenile court conducted a contested jurisdiction/disposition hearing. After testimony and argument, the court found V.A. to be the minor's presumed father under section 7611(d). The juvenile court thereafter sustained the allegations of the second amended petition; it ordered that the minor continue his placement out of the home, and that mother and V.A. receive family reunification services.

On appeal, mother contends that the court erred in finding V.A. the minor's presumed father. She asserts that there was no substantial evidence supporting the

---

[1] All dates stated hereafter are 2020 unless otherwise specified.

[2] Further statutory references are to the Family Code unless otherwise stated.

court's conclusion that V.A. met the two requirements of a presumed parent under section 7611(d) of "receiv[ing] the child into [his] home and openly hold[ing] out the child as [his] natural child."

As was explained by the Second District Court of Appeal, relying on Supreme Court precedent, "[p]resumed fatherhood, for purposes of dependency proceedings, denotes one who 'promptly comes forward and demonstrates a full commitment to his paternal responsibilities—emotional, financial, and otherwise [.]' " (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801-802, fn. omitted, quoting *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 849.) Here, after a careful review of the entire record, we determine that there was an absence of evidence that V.A. came forward promptly to " 'demonstrate[] a full commitment to his paternal responsibilities—emotional, financial, and otherwise' " toward the minor. We therefore conclude that there was no substantial evidence to support the finding that V.A. was the presumed father of the minor under section 7611(d). We will reverse the order after the December 2, 2020 jurisdictional and dispositional hearing with directions that the court enter a new order denying V.A.'s request that he be determined the presumed father.

## I.     FACTS AND PROCEDURAL HISTORY

### A.     Petition and Detention (July 2020)

The Department filed a petition on behalf of the minor under Welfare and Institutions Code section 300, subdivisions (b)(1) and (c) on July 7. The minor had been placed into protective custody on July 2.[3] The Department identified two men, D.R. and B.D., as alleged fathers, the whereabouts of both individuals being unknown.

---

[3] Mother was not home at the time of the minor's removal. She had left the child with an unidentified female for an undetermined period of time. The protective custody warrant was served on mother later in the day after the Department was able to make contact with her.

It was alleged in the petition that mother had a history of untreated substance abuse, including prior use of heroin and recent use of methamphetamine and marijuana, and she had repeatedly refused treatment referrals and had minimized concerns about her substance abuse. The Department also alleged that mother was unable to protect the minor from exposure to domestic violence that her former boyfriend, V.A., perpetrated upon her. V.A was volatile and verbally aggressive toward mother and that aggression had escalated to emotional and physical violence. V.A. had a history of "control[ling] mother's social media accounts, taken her belongings, and prevented her from leaving their home." There had been incidents of domestic violence for more than six years. Mother reported to the social worker on June 29 that V.A.—who mother said was not the minor's father—was "violent towards her 'all the time.'" Mother stated, however, that she "ha[d] not reported the incidents because she [said] she [was] not a 'snitch.'"

The Department alleged that early in the morning on June 29, V.A. had "threatened . . . mother, [had] called [her] derogatory names, and [had] struck her in the face causing her to experience temporary vision loss." According to mother's report to the Department, the incident arose when V.A. followed her to the store and ordered her to get into his car with the minor. After threatening and assaulting mother in the minor's presence, V.A. left with the minor. Mother went home and fell asleep. Mother took no steps to attempt to locate or protect the child until that afternoon, after she was prompted to do so by the emergency response social worker. The Department alleged that mother had permitted V.A. to care for the minor on occasion, and she had "minimize[d] concerns about this despite [V.A.'s] repeatedly perpetrating violence against her, his substance abuse history, and his gang [involvement]."

The emergency response social worker made an unannounced visit to the minor's location on June 29. The social worker spoke with V.A., who said that mother had left the minor in his care. He stated that he had access to mother's home and visited regularly to check up on the minor. V.A. denied that he was the minor's father, saying that B.D.

4

was the father. V.A. said he did not have contact information for B.D. V.A. acknowledged that he had a criminal history of being in gangs, fights, and child endangerment. He also confirmed that he had prior substance abuse charges. V.A. told the social worker that he had a 12-year-old daughter, who had been removed from his care and had been placed with her paternal grandmother. After locating V.A. and the minor, V.A. was arrested on June 29 by law enforcement for domestic violence and kidnapping.

It was alleged by the Department that the whereabouts of alleged fathers, B.D. and D.R., were unknown, and that neither had taken any steps to ensure the safety and well-being of the minor in mother's care.

On July 8, 2020, the court found that a prima facie showing had been made and that the continued detention of the minor with out-of-home placement was necessary.

**B.      Reports & Hearings Prior to Jurisdiction and Disposition Hearing**

**1.      *Jurisdiction/Disposition Report (August 2020)***

In its report filed August 5 in connection with the jurisdiction/disposition hearing, the Department stated that in late June during a child welfare visit, mother told the social worker that she had used marijuana and methamphetamine a few days earlier. She said she used drugs to ease her anxiety when V.A. was around because he was violent toward her. Mother told the social worker that she had completed a rehabilitation program in 2017, and she was in Homes of Loving Father during her pregnancy. The Department offered mother substance abuse services which she declined.

The Department interviewed mother on July 6. She stated that she had been using methamphetamine since she was 13 years old (i.e., 24 years). Mother admitted she had used methamphetamine on July 5. The Department interviewed mother again on July 21. She admitted she had used methamphetamine on July 20; she said she used methamphetamine every other day because she was alone and depressed.

5

Mother advised the Department that B.D. and D.R. were the alleged fathers but she could not provide personal information about them to assist the Department in its search to locate them. Neither alleged father supported the child. Mother stated she did not believe that V.A. was the minor's father, but she wanted him to participate in a paternity test. She stated that her relationship with V.A. had been on and off since March 2020. Mother said that V.A. had "made a key to her house and he would come by the house and help out with the baby and bring them food when she was depressed. . . . [He] was just trying to help out." She was no longer in a relationship with V.A. because of the domestic violence he perpetrated and because he was "very controlling and call[ed] her names."

The Department social worker supervised visits between mother and the minor on two occasions in July. Mother did not appear for two other supervised visits in July.

On July 21, the Department spoke with V.A. He denied that there had been physical violence between mother and him, and he stated he had not raised his voice in front of the minor. V.A. said he was the minor's father as he supported him and loved him like a son; V.A. stated that he wanted to be part of the child's life. He said he was willing to take a paternity test even though he was not in a relationship with mother.

V.A. advised the Department that, in addition to having two adult children, he had a 12-year-old daughter who had been placed by the court in the custody of her paternal grandmother. He said he had been charged in 2013 with domestic violence for which he received probation, and he had completed a 52-week batterer's intervention program imposed as a probation condition. V.A. told the Department that he began using methamphetamine when he was 19 years old and had ceased using drugs after approximately 20 years in 2018. That year, he was arrested for possession of a controlled substance. V.A. was convicted of theft (Pen. Code, § 485) and was on probation until 2021. V.A. had been participating in an outpatient program until the Covid-19 pandemic prevented it.

6

The Department recommended that mother receive family reunification services, and that, because paternity had not been established, no services be offered to the three alleged fathers, V.A., B.D., and D.R.

On September 17, the juvenile court continued the jurisdiction/disposition hearing to allow for DNA testing of V.A. and the minor. Counsel for V.A. was appointed at that time.

### 2. Addendum Report (September 2020)

In an addendum report filed September 25, the Department reported that V.A. was making arrangements for a paternity test.[4] It noted further that, as indicated in an investigative narrative by an emergency response worker, in a June 29 interview, V.A. had introduced himself as mother's cousin and had said he was not related to the minor. And the Department advised that, as reflected in a June 29 report of the San Jose Police Department, V.A. had told the police that he was not the minor's father.

The Department also advised that mother had tested positive for methamphetamines on August 6, negative for any drugs on August 11, and had missed six drug tests thereafter. Mother had not participated in services, and she had reported that she was not doing anything because she was depressed because the minor was not with her. During an interview on September 23, mother explained that she did not believe that V.A. was the minor's father. They were no longer in a relationship. She said she had never permitted V.A. to take care of the minor for more than two hours. The Department reported that mother's interactions with the minor during visits were good but that she had missed a number of visits.

The Department advised that V.A. had told the social worker on September 22 that he was no longer in a relationship with mother, and he again denied prior domestic

---

**4** The record does not reflect when any paternity testing of V.A. was completed or the results of such testing.

violence with her. He also said that he had not contacted the Department for two months because he was hurt and depressed after he was advised that the minor would not be returned to him and he could not visit the minor until paternity was established. V.A. also told the social worker "that regardless of what the paternity test results indicate, he is the father of [the minor] even if [the minor] is not his biological son." When the social worker asked why he had told the police and the emergency response social worker that he was not the minor's father, V.A. responded that "everyone 'wrote it down wrong' . . . [and] that he told them that he is not the biological father of [the minor] but he is the father of the child."

At mother's request, on September 30, the court set a contested jurisdiction/disposition hearing for December 2, 2020.

On October 27, the court made a provisional finding that that V.A. was the presumed father of the minor under section 7611(d).

### 3. Second Addendum Report (November 2020)

In a second addendum report filed November 20, the Department reported that mother had not been engaging in recommended services, but that she was on a waiting list to enter a residential treatment program. Mother advised the Department that one of the alleged fathers had recently been released from jail. She said he had too many children, and he did not want to be part of the minor's life. Mother stated that she had been unable to reach the second alleged father. She told the Department she did not want to provide any contact information concerning the two alleged fathers because one was married to her cousin, and she did "not want to cause . . . trouble with her family. Mother had missed six drug tests between October 1 and November 18. She had been appropriate during her visits with the minor; she had missed two visits.

The Department advised that there had been 10 prior child welfare referrals involving V.A.'s children that dated back to 2002. During November interviews, V.A. advised the social worker that he wanted to be part of the minor's life and would like the

8

opportunity to take care of him. He said he was not seeking custody because he did not have stable housing. V.A. told the social worker that he did not have a plan to raise the minor, but that he would like to receive family reunification services. He said he needed help with employment and housing. V.A. began supervised visits with the minor on November 3; he missed one visit because he said he had forgotten about it. He was appropriate during the visits.

V.A. told the Department that he became homeless in 2018, and that he had been staying with family and friends since that time. He advised that he smoked marijuana to address headaches he suffered as a result of a prior brain injury sustained in or prior to 2011 He declined to participate in a voluntary drug test because he stated he would test positive for marijuana.

The Department recommended that, assuming the court found him to be the presumed father, V.A. be offered family reunification services.

The Department filed a first amended petition on November 25. It filed a second amended petition on December 2. As compared with the original petition, the amendments contained in the second amended petition included, inter alia, the allegation that V.A. was the father of the minor; deletion of references to V.A.'s having struck mother on June 29; and deletion of references to V.A.'s gang involvement.[5]

---

[5] The first amended petition contained new allegations, subsequently deleted in the second amended petition, including that V.A. had previously completed a 52-week batterer's intervention program but had continued to perpetrate domestic violence toward mother; V.A. had an untreated substance abuse problem (i.e., smoking marijuana three times a week) that negatively affected his ability to care for the minor; and V.A. has three older children for whom there had been 10 prior child welfare referrals, including a referral that resulted in a 2011 family court determination that it was in the best interest V.A.'s daughter that sole legal and physical custody for her be granted to her paternal grandmother because of V.A.'s brain injury and drug use.

9

### C. Contested Jurisdiction/Disposition Hearing (December 2020)[6]

The court conducted a contested jurisdiction and disposition hearing on December 2, 2020. The court first heard evidence concerning V.A.'s request that he be determined the minor's presumed father pursuant to section 7611(d). Two witnesses, V.A. and mother, provided testimony on this issue. After hearing argument of counsel,[7] the juvenile court found that V.A. met the requirements of a presumed father under section 7611(d).

The court stated that it could consider a variety of factors in determining whether a finding of presumed parent status should be made and that "[n]o single factor is determinative." The court observed that V.A. (1) lived with mother and the minor for at least one week; (2) made daily visits for some period of time; (3) provided "very limited" financial support in the form of food, diapers, and gifts; (4) had, at times held the minor out as his child; and (5) had been visiting the minor, which the court described as "commendable." Additionally, the court acknowledged that "there has been some equivocation by [V.A.] about whether he really considers [the minor] his own." It concluded that although it was "not the strongest case," it was sufficient to satisfy the standard of proof by a preponderance of the evidence.

---

[6] The evidence presented at the contested jurisdiction/disposition hearing is discussed in detail, *post*.

[7] Argument in support of finding V.A. the presumed father was offered by counsel for V.A. and counsel for the minor. Counsel for mother argued in opposition to the finding. Counsel for the Department, while indicating that the agency would "submit the ultimate findings to the court," presented argument that disputed that V.A. had made a showing that he had a parental relationship with the minor. Department's counsel asserted, inter alia, that (1) V.A. did not satisfy many of the factors relevant to a finding of presumed father status recited in case law; (2) V.A. had made statements to a social worker and to the police that he was not the minor's father; and (3) the evidence in its totality did not yield the conclusion that V.A. had a "fully developed relationship" with the minor.

The juvenile court, addressing mother's opposition, observed that it appeared to be based primarily upon concerns that "[V.A.] is stepping up to claim paternity as a means to exert control over [mother]." The court stated that it understood mother's concerns, and that it "has some of those same concerns as to [V.A.'s] true motives in this case, particularly given that he did not initially appear for a couple of months in this case There seems to have been a little bit of equivocation as to whether he wanted to be a presumed father. So [the court] think[s] mother's fears are certainly understandable." The juvenile court held, however, that mother's concerns were insufficient to rebut by clear and convincing evidence V.A.'s showing establishing presumed father status under section 7611(d).

The juvenile court sustained the allegations of the second amended petition, and it found the minor to be a dependent child. The court ordered out-of-home placement. It ordered that mother and V.A. receive reunification services. And the court included random drug and alcohol testing, a parenting class, and supervised visitation in the respective case plans of mother and V.A. V.A. was also ordered to complete a 52-week batterer's intervention program.

Mother filed a timely notice of appeal from the order after the December 2, 2020 jurisdiction/disposition hearing.

## II.    DISCUSSION

### A.    Presumed Father Status Under Section 7611(d)[8]

There are four categories of fathers in dependency proceedings, namely, "de facto fathers, alleged fathers, natural fathers and presumed fathers. A man, such as a stepfather, who has assumed the role of parent, is a 'de facto father.' A man who may be

---

[8] Although section 7611 uses the term "presumed parent," because in this instance we are dealing with a presumed father, and some cases use that terminology, we will generally use the term "presumed father" here.

the father of the dependent child but has not been established to be the natural or presumed father is an 'alleged father.'  A man who has been established to be the biological father is a 'natural father.'  A man who has held the child out as his own and received the child into his home is a 'presumed father.'  A 'natural father' can be, but is not necessarily, a 'presumed father' and a 'presumed father' can be, but is not necessarily, a 'natural father.'  (*In re Jerry P.*, *supra*, 95 Cal.App.4th at p. 801, fns. omitted.)  "Presumed father status ranks the highest."  (*Ibid.*)  "Presumed father status entitles the father to appointed counsel, custody (absent a finding of detriment), and a reunification plan.  [Citations.]"  (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1209, fn. omitted (*T.R.*).)

"Presumed fatherhood, for purposes of dependency proceedings, denotes one who 'promptly comes forward and demonstrates a full commitment to his paternal responsibilities—emotional, financial, and otherwise [.]' "  (*In re Jerry P., supra*, 95 Cal.App.4th at pp. 801-802, fn. omitted, quoting *Adoption of Kelsey S.*, *supra*, 1 Cal.4th at p. 849.)  "To identify fathers who, by reason of their parenting relationship, are entitled to seek reunification services and custody the Legislature borrowed the categories of men who are 'presumed to be the natural father[s]' of children under Family Code section 7611, hence the term 'presumed father.' "  (*In re Jerry P., supra*, at p. 802.)

Section 7611 provides for presumed status under several circumstances, most of which involve marriage or attempted marriage between the natural mother and the presumed parent.  (See § 7611, subds. (a)–(c).)  The statutory presumption provision relevant here is subdivision (d), under which "[t]he presumed parent receives the child into their home and openly holds out the child as their natural child."  (§ 7611(d).)  The fact that the man does not have "a biological relationship to the child [does not] *automatically* defeat[] presumed father status."  (*In re Jerry P., supra*, 95 Cal.App.4th at p. 803, original italics.)  Further, " '[b]iological fatherhood does not, in and of itself,

12

qualify a man for presumed father status under section 7611.' [Citation.]" (*In re L.L.* (2017) 13 Cal.App.5th 1302, 1310.)

As a panel of this court has explained, presumed fatherhood under section 7611(d) "requires something more than a man's being the mother's casual friend or long-term boyfriend; he must be 'someone who has entered into a familial relationship with the child: someone who has demonstrated an abiding commitment to the child and the child's well-being' regardless of his relationship with the mother. [Citation.]" (*In re D.M.* (2012) 210 Cal.App.4th 541, 553.) " '[T]he core issues are the person's established relationship with and demonstrated commitment to the child.' [Citation.] 'Presumed parent status is afforded only to a person with a fully developed parental relationship with the child . . . .' [Citation.]" (*In re L.L.*, *supra*, 13 Cal.App.5th at p. 1310; see also *W.S. v. S.T.* (2018) 20 Cal.App.5th 132, 147-148 ["common thread . . . is that the parent seeking presumed parent status could show the existence of a parent-child relationship based on assuming parental responsibilities, demonstrating commitment to the child, and providing support"].)

There are no particular factors that must be considered by the trial court in determining whether there has been receipt of the child into the home (*W.S. v. S.T.*, *supra*, 20 Cal.App.5th at p. 145), and "[n]o single factor is determinative." (*R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 774.) Further, there "is no requirement that a child live with a parent for the parent to achieve presumed parent status. [Citation.]" (*Id.* at p. 144.) But as explained by the court in *T.R.*, *supra*, 132 Cal.App.4th at page 1211, courts consider various factors in determining whether, to establish presumed fatherhood, the man has "receive[d] the child into [his] home and openly [held] out the child as [his] natural child." (§ 7611(d).) A nonexclusive list of these factors includes "[1] whether the man actively helped the mother in prenatal care; [2] whether he paid pregnancy and birth expenses commensurate with his ability to do so; [3] whether he promptly took legal action to obtain custody of the child; [4] whether he sought to have his name placed on

13

the birth certificate; [5] whether and how long he cared for the child; [6] whether there is unequivocal evidence that he had acknowledged the child; [7] the number of people to whom he had acknowledged the child; [8] whether he provided for the child after [the child] no longer resided with him; [9] whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and [10] whether his care was merely incidental. [Citations.]" (*T.R.*, *supra*, at p. 1211.) "[T]he court may consider all the circumstances when deciding whether the person demonstrated a parental relationship by holding out the child as his or her own and assuming responsibility for the child by receiving the child into his or her home. [Citations.]" (*R.M. v. T.A.*, *supra*, at p. 774.)

## B.     Standard of Review

V.A., as the man claiming status as a presumed father, bears the burden of proving the facts in support of his entitlement to that status by a preponderance of the evidence. (*In re J.O.* (2009) 178 Cal.App.4th 139, 147, abrogated on other grounds by *In re R.T.* (2017) 3 Cal.5th 622.) If the presumption under section 7611(d) is established, it "may be rebutted in an appropriate action only by clear and convincing evidence." (§ 7612, subd. (a).)

We review the trial court's factual findings concerning a determination regarding presumed parent status, including findings as to whether the claimant received the child into his or her home and whether he or she openly held the child out as claimant's natural child, for substantial evidence. (*S.Y. v. S.B.* (2011) 201 Cal.App.4th 1023, 1031.) Under that standard, we "must view the evidence in a light most favorable to the respondent. We must indulge in all legitimate and reasonable inferences to uphold the [decision]. If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed. [Citations.] ' " '[W]hen two or more inferences can reasonably be deduced from the facts,' either deduction will be supported by substantial evidence, and 'a reviewing court is without power to substitute its deductions for those of the trial court.' [Citations.]" [Citation.]' [Citation.]" (*In re Misako R.* (1991) 2 Cal.App.4th

14

538, 545.) "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record. [Citation.]" (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 652 (*Roddenberry*).)

### C. The Order Finding V.A. the Presumed Father Must Be Reversed

#### 1. Contentions of the Parties

Mother argues that V.A. failed to establish that he was the minor's presumed father. Reciting the requirements of section 7611(d) that to be a presumed father, the man must show that he "receive[d] the child into [his] home and openly [held] out the child as [his] natural child," mother asserts that V.A. did not hold the minor out as his natural son She argues further that although there was "at least some evidence [V.A.] brought [the minor] to his home and—on some occasions—indicated he wished to be thought of as the child's father," viewing the circumstances as a whole, there was no substantial evidence to support the juvenile court's conclusion that V.A. showed a parental relationship and assumed responsibility for the minor to attain presumed father status.[9]

V.A. responds that mother is barred from challenging whether V.A. satisfied the requirements of section 7611(d) because of an alleged concession made by mother's counsel at the hearing. V.A. argues further that substantial evidence supports the court's finding that V.A. was the minor's presumed father under section 7611(d).[10]

---

[9] Mother does not challenge the findings of the court from the combined jurisdiction and disposition hearing other than the finding that V.A. was the presumed father.

[10] The Department submitted a letter to this court stating it would not be taking a position in the appeal concerning the court's presumed parent finding. The Department indicated that while it "recognizes its general obligation to 'aid the appellate court in sustaining the judgment' [citation], [its] decision not to take a position on this issue comports with its actions below, where the Department did not take a position on the parentage issue before the juvenile court."

15

### 2. *Evidence Presented at the Hearing*

#### a.   Testimony of V.A.

V.A. testified that at the time mother learned of her pregnancy, they were together. V.A. went to the hospital after the minor was born. He signed no paperwork at the hospital indicating he was the father. V.A. testified that he was not the minor's biological father. But he considered himself to be the minor's father, and he "tell[s] everybody he's my son." V.A. stated that he tells family members that the minor is his baby. The minor calls him "Dada."

V.A. explained that there was a "very short" period of time—in approximately May 2020—that V.A., mother, and the minor lived together.[11] Before dependency proceedings commenced in July, V.A. on occasion took the minor to the home of V.A.'s daughter to visit with her son; one occasion was an overnight visit. The minor had one overnight visit with V.A.'s niece; V.A. did not sleep over on that occasion. V.A. testified that approximately three times a week, he took the minor for day visits to V.A.'s home— which was apparently the home of V.A.'s mother. There was one overnight visit. V.A. testified that his family "would all welcome [him] as if he were—they know that he's biologically not my child, but they treat him still as if he is."

V.A. testified that before the proceedings commenced in July, he visited the minor daily at mother's home.[12] He would sometimes stay for three to four hours, leave, and

---

[11] V.A. expressed uncertainty as to the precise month in 2020 that he had lived for a short time with mother. Mother testified that V.A. lived with her for approximately one week in March after the County's shelter-in-place directive went into effect. We believe from our review of the record that it is more likely that the short period mother and V.A. lived together was in March.

[12] The record from V.A.'s testimony is vague as to the timing of these daily visits. While it appears that they occurred up to the time the minor was detained in July 2020, it is unclear when they started. Based upon evidence in the record that mother was in Homes of Loving Father during her pregnancy and apparently did not obtain housing after the birth of the minor (September 2019) until March 2020, it appears that the period

then return for another two hours. The amount of time V.A. spent at the home of mother and the minor varied; on some days, he was there all day. V.A. on occasion would bring toys, snacks, baby formula, and diapers. He would change the minor's diapers, play with him, and feed him. V.A. agreed that mother on some occasions asked V.A. to come over to take care of the minor. But many times, V.A. went over to visit the minor even if mother did not need help. On cross-examination by counsel for the Department, V.A. agreed that he had never been the minor's primary caretaker.

V.A. testified that on one occasion, and without consulting mother, he had taken the minor to the emergency room to have a bad diaper rash examined. V.A. did not attend any of the minor's medical appointments, nor did mother ever ask him to take the minor to such appointments.

V.A. testified that since the court ordered that he receive visitation, he had been visiting the minor and that those visits had been getting better as the minor became comfortable with him. V.A. felt he was beginning to build a bond again with the minor. During the visits, he would do "[s]illy things" with the minor, and would bring toys for the minor to play with. V.A. admitted that the Department had offered him expanded visitation (from one-hour to two-hour visits), but he had declined the offer, telling the social worker he was not ready to spend more time with the minor and he wanted the child to get more comfortable with him.

V.A. was asking for presumed father status with the understanding that such a finding might have consequences relative to child support. He testified that he wanted to become the presumed father because "[p]lain and simply because I love him. I fell in love with his smile when I first [saw] him. . . . And that just made me smile. Words can't

---

of time V.A. visited the minor was from March (after mother had him move out) to early July.

17

explain how much I love him.  But I do treat him as one of my own.  And I would do just about anything in my power to make him happy."

V.A. testified that he was not seeking custody of the minor; he wanted to show that he was ready "for that big step."  He needed help with employment and housing, and he had told the social worker that he would like a chance.

### b.        Testimony of Mother

Mother testified that she and V.A. were second cousins, and they had known each other their whole lives.  They had been a couple on and off for seven years, but before March 2020, they had never lived together.  After the minor was born in September 2019, mother had wanted to work things out with V.A.  Mother testified that before March 2020, V.A. had not visited the minor and had not provided things for him, such as diapers or food.  But mother testified that she could not say how much time V.A. and the minor spent together after he was born because the minor did bond with V.A.  V.A., mother, and the minor spent Thanksgiving night in 2019 at the home of V.A.'s mother.

For approximately one week in March 2020, after the shelter-in-place directive of the Covid-19 pandemic was instituted, V.A. lived with her and the minor; this was, however, not his only residence.  This occurred just after mother had retained housing.  After about one week, mother asked V.A. to leave after he had returned "to his old ways" of domestic abuse.  Mother said she "just . . . refused to put [her] son through that."  Mother denied that V.A. had provided for the minor, stating, "No. I had . . . money.  It was my money he used probably."  During that approximate one week, V.A. changed the minor's diapers and did fatherly things with him.

After V.A. moved out, he initially did not have a key and for two or three weeks did not visit the minor.  After some period of time, V.A.—through intimidation— convinced mother to give him a key in about early May.  V.A. would come over every day, during the daytime.  As time went on, he would show up at 3:00 or 4:00 in the morning, when the minor was asleep.  V.A. brought diapers that had been donated and

18

brought movies to watch with the minor. One time, V.A. took the minor with mother's consent because she was depressed. When V.A. returned with the minor, she "had an anxiety attack because [the minor] came back screaming with no bottle and his eyes were all red." Mother testified that she had never allowed V.A. to take the minor out of the home after that occasion, "[b]ut [V.A.] would take him anyways." On one occasion, mother permitted V.A.'s niece to take the minor overnight because she and V.A. were fighting, and she thought it would be best for the child.

Mother testified that V.A. had told their family that the minor was his son. They acted like family with the extended relatives. She admitted that V.A. loved the minor. Mother testified that the minor called V.A. "Dada," but that the child called every man, including the social worker supervising visitation, "Dada."

Mother explained that she opposed a determination that V.A. was the minor's presumed father because of his domestic violence history with her. She was concerned that V.A.'s efforts to become presumed father were another attempt to assert control and power over mother and her life.

### 3. *Mother's Challenge Is Not Waived*

V.A. contends that mother has waived her appellate challenge based upon an alleged concession below that V.A. met the criteria specified in section 7611(d).[13] He

---

[13] V.A. in fact argues that by virtue of the statement made by counsel below, mother has *forfeited* her appellate challenge As our Supreme Court has explained: "Although the loss of the right to challenge a ruling on appeal because of the failure to object in the trial court is often referred to as a 'waiver,' the correct legal term for the loss of a right based on failure to timely assert it is 'forfeiture,' because a person who fails to preserve a claim forfeits that claim. In contrast, a waiver is the ' "intentional relinquishment or abandonment of a known right." ' [Citations.]" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2.) Here, V.A.'s contention is that mother's counsel below *conceded* that V.A. met the requirements of section 7611(d) by his express statements during the hearing. It thus appears that the proper term here that describes the alleged conduct asserted by V.A. as precluding the appellate claim is waiver.

bases this contention upon the following statement made by mother's counsel during argument below: "I agree *superficially* that, you know, the evidence presented today, [V.A.] *probably* does meet the 7611(d) factors, including telling others that [the minor] is his son, providing for him, however minimally, and taking him into his home." (Italics added.) We do not find waiver here.

First, the statement of mother's counsel must be considered in the context of the entire argument. Counsel argued that V.A.'s contacts with the minor should be considered in the context of his being "a long time off[-]and[-]on boyfriend of [mother]." The contention of mother's counsel was that V.A.'s involvement with the minor was insincere, in that V.A.'s contacts with the minor were, in fact, efforts to control and get closer to mother. Counsel therefore requested that the court deny presumed father status to V.A. Thus, contrary to V.A.'s position here that mother waived her appellate challenge because her trial counsel agreed that V.A. met the qualifications of a presumed father, mother's counsel in fact opposed the requested finding. There was no waiver.

Second, the statement relied on by V.A. is not a concession that precludes mother's appellate challenge. Mother's counsel argued that "*superficially* . . . the evidence presented today . . . *probably* does meet the 7611(d) factors . . . ." (Italics added.) The italicized qualifiers included in counsel's statement militate against concluding that counsel conceded V.A. was entitled to a presumed father finding. "[A] waiver is the ' "intentional relinquishment or abandonment of a known right." ' [Citations.]" (*In re S.B.*, *supra*, 32 Cal.4th at p. 1293, fn. 2.) Counsel's statement did not constitute such an intentional relinquishment or abandonment of a known right to challenge V.A.'s claim to be considered a presumed father. Mother did not waive her appellate claim here. (See *Lovett v. Carrasco* (1998) 63 Cal.App.4th 48, 53 [where statement attributed to "counsel is ambiguous regarding waiver of the right to appeal, it does not constitute an express waiver of that right"].)

20

### 4. *Presumed Father Finding Not Supported by Substantial Evidence*

In order for V.A. to have been found to be a presumed father here, he must have established by a preponderance of the evidence (*In re J.O.*, *supra*, 178 Cal.App.4th at p. 147) that he "receive[d] the child into [his] home and openly [held] out the child as [his] natural child." (§ 7611(d).) As explained by case law, in the context of a dependency proceeding, a presumed father is "one who 'promptly comes forward and demonstrates a full commitment to his paternal responsibilities—emotional, financial, and otherwise[.]' " (*Jerry P., supra*, 95 Cal.App.4th at pp. 801-802, fn. omitted.) Otherwise explained, " '[p]resumed parent status is afforded only to a person with a fully developed parental relationship with the child . . . .' [Citation.]" (*In re L.L.*, *supra*, 13 Cal.App.5th at p. 1310.) We examine whether the juvenile court's factual findings for its conclusion that V.A. met the requirements under section 7611(d) for presumed fatherhood were supported by substantial evidence. (*S.Y. v. S.B.*, *supra*, 201 Cal.App.4th at p. 1031.)

Although there are no specific factors that the juvenile court *must* consider in determining whether the claimed father received the child into his home (*W.S. v. S.T.*, *supra*, 20 Cal.App.5th at p. 145), "the court may consider *all the circumstances* when deciding whether the person demonstrated a parental relationship by holding out the child as his . . . own and assuming responsibility for the child by receiving the child into his . . . home. [Citations.]" (*R.M. v. T.A.*, *supra*, 233 Cal.App.4th at p. 774, italics added.) We consider those circumstances here in reviewing the juvenile court's findings. In doing so, we are mindful that presumed fatherhood "requires something more than a man's being the mother's casual friend or long-term boyfriend . . . [Rather, it involves] 'someone who has entered into a familial relationship with the child: someone who has demonstrated an abiding commitment to the child and the child's well-being' regardless of his relationship with the mother. [Citation.]" (*In re D.M.*, *supra*, 210 Cal.App.4th at p. 553.)

21

The *T.R* court identified 10 concerns in its nonexclusive list of relevant factors in making a presumed fatherhood determination under section 7611(d): "[1] [W]hether the man actively helped the mother in prenatal care; [2] whether he paid pregnancy and birth expenses commensurate with his ability to do so; [3] whether he promptly took legal action to obtain custody of the child; [4] whether he sought to have his name placed on the birth certificate; [5] whether and how long he cared for the child; [6] whether there is unequivocal evidence that he had acknowledged the child; [7] the number of people to whom he had acknowledged the child; [8] whether he provided for the child after [the child] no longer resided with him; [9] whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and [10] whether his care was merely incidental. [Citations.]" (*T.R.*, *supra*, 132 Cal.App.4th at p.1211.) We consider these 10 *T.R.* factors in our review of the juvenile court's finding that V.A. met his burden of establishing by a preponderance of the evidence his status as a presumed father.

*1. Prenatal care assistance.* There is no evidence that V.A. actively helped mother in any way in connection with her prenatal care.

*2, Pregnancy and birth expenses.* There is nothing in the record that suggests that V.A. paid any of mother's pregnancy or birth expenses.

*3. Prompt legal action.* There is no evidence that V.A. took legal action—prompt or otherwise—to obtain custody of the minor. To the contrary, as of the time of the jurisdiction/disposition hearing—when the minor was 15 months old—V.A. eschewed custody of the minor, indicating in his testimony that he wanted to demonstrate in the future his readiness "for that big step."

*4. Birth certificate listing.* There is no evidence that V.A. sought to have his name placed on the minor's birth certificate.

*5. Whether (and how long) care was provided to child.* The issue of whether—and the length of time—V.A. provided care for the minor should be considered separately as to two different time periods: (1) from the minor's birth in September 2019

22

to March 2020; and (2) from March to July 2, 2020, when the minor was placed into protective custody after the June 29 domestic violence incident resulting in V.A.'s arrest.

For the first six months of the minor's life—from September 2019 to March 2020—there was no evidence that V.A. provided any care of the minor. The only evidence of V.A.'s involvement with—*not care of*—the child was his going to the hospital after the minor was born, and his having an overnight visit on Thanksgiving night with mother and the minor at the home of V.A.'s mother.

V.A. admitted in his testimony that he had never been the minor's primary caretaker. And, as discussed, there was no evidence that he provided any care to the minor for the first six months of the minor's life. During the period of March to June 29, however, V.A. provided *some* care to the child. For the approximate week in March that he lived with mother and the minor, V.A. (according to mother's testimony) changed the minor's diapers and did fatherly things with him. After V.A. moved out, he frequently visited the minor, oftentimes making multiple visits per day. (Some of those visits by V.A., according to mother's testimony, were in the middle of the night, so that they involved no care of the minor.) According to V.A.'s testimony, he would on occasion would bring toys, snacks, baby formula, and diapers, and he would change the minor's diapers, play with him, and feed him. The juvenile court characterized this as V.A.'s having provided "very limited" financial support. Occasionally, V.A. went to mother's home to take care of the minor at mother's request. And on one occasion, and without consulting mother, he took the minor to the emergency room to have a bad diaper rash examined. But V.A. did not attend any of the minor's medical appointments, nor did mother ever ask him to take the minor to such appointments. Therefore, the record shows that V.A., at most, provided occasional care to the minor, and then, for only four of the first ten months of the minor's life.

6.      *Unequivocal evidence of acknowledgment of minor.*  V.A. testified that he told family members the minor was his baby, and he told "everyone" the minor was his

son. Mother also testified that V.A. had told their family that the minor was his son. But the evidence that V.A. acknowledged the minor as his child was *not* unequivocal. On June 29, V.A. introduced himself to an emergency response social worker as mother's cousin and said he was not related to the minor. Further, on the same day, V.A. told the police that he was not the minor's father. V.A., addressing these June 29 statements approximately three months later, told the Department that "everyone 'wrote it down wrong' . . . [and] that he told them that he is not the biological father of [the minor] but he is the father of the child." We observe that, in light of the fact that V.A. made the statement to the police at or about the time he was arrested for kidnapping the minor, it would have been seemingly to V.A.'s advantage to have made it clear to the police that he was the minor's father. V.A.'s dispute about what he said notwithstanding, the evidence that V.A. acknowledged the minor as his child was *not* unequivocal.

The juvenile court found V.A.'s statements disavowing his relationship with the minor significant enough to specifically comment about them twice at the hearing. The juvenile court judge said, "I do think there has been some equivocation by [V.A.] about whether or not he really considers [the minor] his own. . . . Although, I do understand that it could have been a little bit of a misunderstanding as to whether he was denying biological relationship with [the minor], as opposed to denying that he was the father. But, in any event, you would think that if he wanted to be construed as the father[,] he [would] have made that clear." And, in addressing mother's opposition, the court reiterated that "[t]here seems to have been a little bit of equivocation as to whether [V.A.] wanted to be a presumed father."

The evidence that V.A. acknowledged the minor as his child was not unequivocal.

7. *Number of people to whom V.A. acknowledged minor.* V.A. testified that he told family members the minor was his baby and told "everyone" the minor was his son. But the record is entirely unclear as to the number of people to whom V.A.

acknowledged the minor as his child, since his testimony was in general terms that he made this acknowledgement to his family and to "everyone."**14**

8. *Providing for child after he no longer lived with presumed parent*. On the question of "whether [V.A.] provided for the child after [he] no longer resided with him" (*T.R.*, *supra*, 132 Cal.App.4th at p.1211), as noted, there was only about one week that V.A. lived with the minor. And during that time, according to mother's testimony, it was her money that was used for support, and V.A. provided no support for the minor. Nonetheless, to the extent this factor applies at all, there was evidence from V.A. that after he moved out in March, he would bring toys, snacks, baby formula, and diapers for the minor during V.A.'s visits, which the court characterized as "very limited" financial support. There was no evidence that V.A. provided any other financial support to mother in caring for the minor.

9. *Public benefits procurement*. There was evidence that mother was unemployed, and the minor may have therefore needed public benefits. There was no evidence that V.A. pursued completion of paperwork for this purpose.

10. *Whether care was incidental*. As discussed, *ante*, there was no evidence that V.A. provided any care to the minor for the first six months of his life—from September 2019 to sometime in March 2020. There was approximately one week, in March, that V.A. lived with mother and the minor in which V.A. changed the minor's diapers and did fatherly things with him. And after V.A. moved out in March to June 29,

---

**14** Mother emphasizes in her opening brief that V.A. at the hearing admitted under oath that he was not the minor's biological father. To the extent mother suggests from this fact that V.A. could not therefore be determined the minor's presumed father under section 7611(d), we disagree. A man claiming to be a presumed father cannot be penalized for testifying truthfully under oath that he is not the child's biological father. To hold otherwise would be contrary to the law. (See *In re Jerry P., supra*, 95 Cal.App.4th at p. 803 [fact that the man does not have "a biological relationship to the child [does not] *automatically* defeat[] presumed father status"].)

he made frequent visits to the minor at mother's home, some occurring in the middle of the night. V.A. would on occasion would bring toys, snacks, baby formula, and diapers, and he would change the minor's diapers, play with him, and feed him. On one occasion, he took the minor to the emergency room to have a bad diaper rash examined. But V.A. did not attend any of the minor's medical appointments. Therefore, the record below shows that V.A., at most, provided incidental or occasional care to the minor, and that this limited amount of care was provided during only four of the first ten months of the minor's life.[15]

---

[15] Several cases in which the alleged father was not a presumed father because of a lack of commitment to the child are illustrative here. For example, in *In re D.A.* (2012) 204 Cal.App.4th 811, 815, the alleged father, who was the mother's boyfriend, had lived with the mother and the child for a period of two weeks before, and two weeks after, the child was born. He took mother to some prenatal appointments, and he was with mother when the child was born. (*Ibid.*) After they no longer lived together, the alleged father occasionally cared for the child overnight when the mother dropped the child off at his home. (*Ibid.*) He did not sign a voluntary declaration of paternity, although mother had listed him as the father on the birth certificate, apparently without his involvement in the process. (*Id.* at pp. 815, 826, 827.) The alleged father did not openly admit paternity. (*Id.* at p. 827.) The appellate court concluded that the trial court's presumed father finding as to the alleged father was not supported by substantial evidence. (*Ibid.*) In *In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1650, the alleged father had lived with the mother and the child for two years but was unemployed during that time. He was equivocal in asserting a parental relationship with the child. He told friends, relatives, and neighbors he was the father, and the child called him " 'daddy.' " (*Id.* at p. 1651.) But on one occasion after the child fell from a window, he told the social worker investigating the incident he was not the father. (*Ibid.*) The alleged father never (1) contacted ADFC to inform it of his relationship with the child, (2) sought to place his name on a birth certificate, (3) took any other legal action to establish paternity (*ibid.*), (4) sought custody, or (5) paid child support (*id.* at p. 1652.) The trial court found that the alleged father had failed to establish "a consistent commitment to assume the burdens of parenthood" (*id.* at p. 1653), and the appellate court held that substantial evidence supported that finding (*id.* at pp. 1653-1655). And in *In re Sarah C.* (1992) 8 Cal.App.4th 964, 969, the alleged father, who was the biological father, lived with the mother and the child for a few months; he provided care to the child, but he did not provide financial support to either of them. He acknowledged the child as his own to a few friends and family. (*Ibid.*) But he took no steps to have his name put on the child's

From the foregoing discussion, we conclude that V.A. satisfied *none* of the 10 relevant factors identified by the *T.R.* court in making a presumed fatherhood determination under section 7611(d).  (See *T.R.*, *supra*, 132 Cal.App.4th at p.1211.)  We acknowledge that, in considering a presumed father claim under section 7611(d), there are no specific factors the juvenile court must consider (*W.S. v. S.T.*, *supra*, 20 Cal.App.5th at p. 145), and that "[n]o single factor is determinative" (*R.M. v. T.A.*, *supra*, 233 Cal.App.4th at p. 774).  But it is, indeed, significant that a consideration of the *T.R.* factors individually and collectively negates a presumed fatherhood finding here.

### 5. *Conclusion*

We have carefully considered the evidence in its totality.  We cannot conclude there was substantial evidence to support the finding that V.A. had established that he had "receive[d] the child into [his] home and openly [held] out the child as [his] natural child."  (§ 7611(d).)  In making this determination, we rely on *In re Jerry P.*, quoting Supreme Court precedent, that to be a presumed father, the man must have " '*promptly* come[] forward and demonstrate[d] a *full commitment* to his paternal responsibilities— *emotional, financial, and otherwise* [.]' " (*In re Jerry P., supra*, 95 Cal.App.4th at pp. 801-802, fn. omitted, italics added, quoting *Adoption of Kelsey S.*, *supra*, 1 Cal.4th at p. 849.)  There is no substantial evidence that V.A. "*promptly* came forward."  The evidence concerning V.A.'s actions toward the minor for the first six months of his life is vague, at best.  There is no indication in the record as to the specifics of V.A.'s contacts or his relationship with the minor.  There was certainly no demonstration by V.A. from

---

birth certificate or to identify the child to governmental agencies as his daughter.  (*Ibid.*) He provided the child with little economic support; and he made negligible efforts while imprisoned to contact her or establish a relationship with her.  (*Id.* at pp. 972–973, 977.) The juvenile court held that he was not a presumed father (*id.* at p. 971), and the appellate court concluded that substantial evidence supported the finding, concluding, inter alia, that the alleged father had "only incidentally provided care to" the child.  (*Id.* at p. 973.)

27

September 2019 to March 2020 of a full commitment—or, indeed, *any* commitment—to paternal responsibilities to the minor.

There is likewise no substantial evidence—without restricting the focus to the first six months of the minor's life—that V.A. " 'demonstrate[d] a *full commitment* to his paternal responsibilities—*emotional, financial, and otherwise* [.]' " (*In re Jerry P., supra*, 95 Cal.App.4th at pp. 801-802, fn. omitted, italics added.) In so concluding, we acknowledge (1) that V.A., according mother's testimony, acted in a fatherly way toward the minor during the approximate one week V.A. lived with mother and the minor in March; (2) V.A.'s frequent visits with the minor after V.A. moved out of the home, including his providing some care for the minor and presenting him for visits with members of V.A.'s family; and (3) V.A.'s testimony, corroborated by mother's testimony, that he loves the minor. These actions of V.A. and his declaration of love for the minor, by themselves, however, are insufficient for a finding by a preponderance of the evidence that he made a full commitment to his parental responsibilities to the child.

As discussed, a presumed fatherhood determination under section 7611(d) here cannot be supported by reference to *any* of the 10 factors identified in *T.R.* (See *T.R., supra*, 132 Cal.App.4th at p.1211.) Any care V.A. provided to the minor "was merely incidental" (*ibid.*) and occurred for no more than four months when the child was between six and ten months old. V.A.'s financial commitment to the minor was minimal, and then, only after the minor was six months old. Likewise, from the record, any emotional commitment V.A. had to the minor manifested itself in or after March 2020. And any financial or emotional commitment did not include V.A.'s unequivocal acknowledgment of the minor as his child, a declaration of paternity, attempts to procure public benefits for the minor, or prompt (or any) legal action to obtain custody. V.A. never sought custody of the minor. In fact, he testified—consistent with what he had previously told the Department—that he was not seeking custody of the minor, indicating that he wanted to demonstrate in the future his readiness "for that big step." Further,

28

V.A. admitted at the hearing that he had declined the Department's offer for expanded visitation of the minor because V.A.—after 15 months had elapsed since the child's birth—was not ready for it.

Moreover, V.A.'s twin denials on March 29 that he was the minor's father—V.A.'s explanation that he was misunderstood by the police and the social worker notwithstanding—belie a full commitment by V.A. to his parental responsibilities. The juvenile court highlighted V.A.'s "equivocation" both in terms of his denials of paternity and his failing to "appear for a couple of months in this case." And it is also significant that the juvenile court shared mother's concerns that V.A.'s motivations in seeking presumed fatherhood were more about exerting control over the mother than being committed to the minor.[16]

In reaching the conclusion that the juvenile court erred in its finding that V.A. was the minor's presumed father, we acknowledge that our review of the juvenile court's findings for substantial evidence is a "deferential" one. (*Chino Commercial Bank, N.A. v. Peters* (2010) 190 Cal.App.4th 1163, 1169.) However, although "[s]ubstantial evidence is a deferential standard, . . . it is not toothless. It is well settled that the standard is not satisfied simply by pointing to ' "isolated evidence torn from the context of the whole record." ' [Citations.] Rather, the evidence supporting the . . . finding must be considered ' "in the light of the whole record" ' 'to determine whether it discloses

---

[16] Although the juvenile court found mother's concerns about V.A.'s true motivation for seeking presumed father status "certainly understandable" and "ha[d] some of those same concerns as to [V.A.'s] true motives," it concluded that they did not rise to the level of a clear and convincing showing by mother to rebut the presumption of fatherhood that V.A. had proved. Because we conclude there was no substantial evidence to support the court's finding that V.A. had met his burden of establishing presumed father status under section 7611(d) by a preponderance of the evidence, there was no presumption that was subject to rebuttal by mother.

substantial evidence—that is, evidence which is reasonable, credible, and of solid value . . . .' [Citation.]" (*In re I.C.* (2018) 4 Cal.5th 869, 892.)

As we have observed, in considering a claim of presumed parent status, " '[t]he core issues are the person's established relationship with and demonstrated commitment to the child.' [Citation.] 'Presumed parent status is afforded only to a person with a fully developed parental relationship with the child . . . .' [Citation.]" (*In re L.L.*, *supra*, 13 Cal.App.5th at p. 1310.) In considering the juvenile court's ruling, we must determine whether "it [was] reasonable for the trier of fact to [have made] the ruling in question in light of the whole record. [Citation.]" (*Roddenberry*, *supra*, 44 Cal.App.4th at p. 652.) We have carefully reviewed the entire record, and we conclude that there was no substantial evidence that V.A. had an " 'established relationship with and demonstrated commitment to the child' [and] a fully developed parental relationship with [him] . . . .' [Citation.]" (*In re L.L.*, *supra*, at p. 1310.) In so concluding, we acknowledge that "[t]here is a compelling state interest in establishing parentage." (§ 7570, subd. (a)(1).) But that interest does not extend to finding a person to be a presumed parent under section 7611 where the statutory criteria are not satisfied.

The juvenile court therefore erred in determining that V.A. was the presumed father of the minor under section 7611(d).

### III.    DISPOSITION

The order after the December 2, 2020 jurisdictional and dispositional hearing is reversed. The matter is remanded to the juvenile court with directions to enter a new and different order denying V.A.'s request that he be determined the presumed father of the minor and modifying the prior order further as appropriate in light of such denial of presumed father status.

30

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____
ELIA, ACTING P.J.

_____
DANNER, J.

*In re J.R.; DFCS v. A.R.*
*H048689*