Filed 12/30/21  In re Clare M. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Clare M. et al., Persons Coming Under the Juvenile Court Law. | |
| MARIN COUNTY HEALTH AND HUMAN SERVICES,<br><br>     Plaintiff and Respondent,<br>v.<br>C.E. et al.,<br>     Defendants and Appellants. | A162576<br><br>(Marin County Super. Ct. Nos. JV27036, JV27037) |

This appeal arises from dispositional orders in dependency proceedings brought on behalf of Clare M. (Daughter) and C.M. (Son).[1]  Appellant C.E., the children's mother, challenges the juvenile court's dispositional findings and orders only with respect to the case plans.  Appellant G.L., Daughter's biological father, challenges the denial of his request to be designated Daughter's presumed father.  We will affirm.

---

[1] Superior court case numbers JV27036 and JV27037 pertain to Daughter and Son, respectively.

1

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Petition and Detention*

In December 2020, Marin County Health and Human Services (the Department) filed petitions on behalf of Daughter, then age 5, and Son, then age 3, alleging that they came within the jurisdiction of the juvenile court under Welfare and Institutions Code section 300, subdivision (b)(1), failure to protect.[2]  The petitions alleged that abuse of alcohol by C.E. (Mother) made her unable to provide regular care for the children, and that her violent and aggressive behavior, which she exhibited in front of the children, made her unable to supervise and protect them, with the result that there was a substantial risk that they would suffer serious physical harm or illness.

The petition as to Daughter alleged that her alleged father, G.L., had failed to adequately supervise or protect her.  He had not provided her with regular care consistently during her life, or ensured that her medical, dental, or basic needs were met.  The petition as to Son alleged that his alleged father, N.M., was unable to supervise and protect Son because he had recently been arrested and that he had failed to ensure that Son received regular medical and dental care.[3]

According to the Detention Reports, the family came to the Department's attention in early December 2020 after police officers conducted a welfare check at the boat where Mother was living with her mother (Grandmother), Daughter, and Son, and then reported that Mother was unable to care for the children because of her intoxication and

---

[2] Further statutory references are to the Welfare and Institutions Code.

[3] There is no dispute that G.L. is Daughter's biological father and N.M. is Son's.  N.M. is not a party to this appeal, and we refer to him only to provide context.

uncooperativeness. The police officers, responding to reports of yelling and arguing coming from the boat, found that the boat had no plumbing, so the children were able to bathe only about once a week, and the family had to urinate and defecate in buckets. The boat's railing had a large gap that a child could fall through, and the dock was narrow and unstable, with broken planks that a child could fall through. The children appeared not to have bathed in several days, and had dirty faces, hair, and clothes.

The officers were unable to communicate effectively with Mother, who was intoxicated and confrontational. When she was informed that Department social workers would be contacted, she began to yell, and threatened that if social workers came to the boat she would harm them and shoot herself and the children. Mother left the boat on foot, did not say where she was going, and was not located that night. The officers were told that Mother begins to drink in the morning and sleeps all day, and the children are usually left alone with no supervision.

Grandmother told social workers that she believed Mother needed treatment for alcohol use, though Mother denied having an alcohol problem. Grandmother said that Mother and the children had been living in New Mexico, had come to California from New Mexico to get birth certificates for Daughter and Son, and lived for a while at G.L.'s home in Davis, California, until an incident (the nature of which was never specified) occurred that caused Grandmother to pick them up. Neither of the children had a birth certificate; they went by N.M.'s last name. Mother reported that the children had not had regular medical care through their lives. She said she took them to a clinic in New Mexico when they got sick, but she could not get a physical appointment for them because they had no medical history.

Daughter told a social worker that she had attended school in New Mexico but stopped going because other children were mean to her.[4] She said Mother was "mean when she gets drunk." She also said that Mother had been drinking for years but did not drink before Daughter and Son were born; Daughter said she knew this because Mother told her. Son said that he "yells and cries" when Mother is mean to him. Daughter said that she had seen her grandfather punch Mother in the stomach and pull her hair, and that her father, G.L., "fights with my mom like grandpa" and that she had seen G.L. "whack" Mother in the face.

Mother told a social worker that she and G.L. had been together for two months before she became pregnant with Daughter, who was G.L.'s biological child. G.L. was not present during the pregnancy or for the birth, had not provided care for Daughter throughout her life, and had only recently met Daughter. She said Daughter was born in California and had no birth certificate. Grandmother reported that she had been a witness to Daughter's birth, which took place at home in California.

G.L. told a social worker that he was Daughter's biological father, that she had been born in New Mexico and that he was present for the birth. He did not know the year in which she was born, and identified a day for her birthday that was different from the day identified by others. He said he and Mother were in a relationship for a year before Daughter was born and a year after her birth, and had not been in a relationship for a number of years.

N.M., Son's biological father, stated that he has a good relationship with Daughter and Son, and that although he is not Daughter's biological father, he came into her life when she was nearly three years old and has

---

[4] Grandmother said Daughter had not been enrolled in school since being in California.

stepped in as a father to her. He said he saw the children on Sundays and provided clothes and groceries for them.

On December 15, 2020, the day of the detention hearing, G.L. filed Judicial Council form JV-505, Statement Regarding Parentage, in which he stated he believed he was Daughter's parent and requested the court to find him her presumed father. He stated that Daughter, who was born in 2014, lived with him from September to November 2020, and at some point in 2018, and that he had told "[e]verybody, friends & family" that Daughter was his child. With respect to activities with Daughter, he stated he had participated in "Being a dad, playing, drawing, when she was a baby I changed her diapers, feeding; making sure she is clean, dressed; appropriate discipline, read to her, tell her stories; warned about 'stranger danger.' " He stated that he had given Daughter "[c]lothes, food, well-being; a home; clean bed, toys; books"; and that his family had not spent as much time with Daughter as he would like, but they had pictures of her.

At the detention hearing, both G.L. and N.M. asked to be designated Daughter's presumed father. Mother told the court, "[Daughter] has been primarily raised by me and [N.M.]." N.M. sought presumed father status "[b]ecause he has lived with [Daughter] for several years and held her out as his child." G.L. sought presumed father status based on the information submitted to the court on form JV-505.

The court admitted the Department's reports into evidence, found that G.L. was Daughter's biological father, and declined to make any finding as to a presumed father for Daughter "at this time." N.M. was elevated to presumed father status for Son. The court found that a prima facie showing had been made that the children came within section 300, and ordered the children detained. A jurisdiction hearing was set for January 2021.

B.    *Jurisdiction*

In reports filed in early January 2021, in advance of the jurisdiction hearing, the Department reported that Mother had spoken with a social worker in early December.  Mother denied she was a heavy drinker.  Mother said she consumes alcohol "more than she should"; she drinks to deal with stress; and she was willing to attend substance abuse treatment.  But Mother was apparently unwilling to communicate further with the Department.  In late December, in response to a request that she call the social worker, Mother sent a text message stating, "We have a claim filed in District court that lists several people from your organization as defendants.  I'm afraid speaking with you at this time is not possible.  And you are not my social worker.  I have no contract with your agency or any agency of the State of California."  The Department had been unable to refer Mother to services, and had no information to suggest that Mother had accessed treatment.

The Department reported that G.L. had an extensive child welfare history, including referrals dating back to 2002 that had been substantiated or found inconclusive, and an extensive criminal history, including 12 convictions dating from 1992 through 2019.  G.L. told the Department that Mother drinks, and he has told her that it's a problem.  In late December, he told the Department that Mother and her children came to live with him "a couple of months ago" after arriving in California from New Mexico; that Mother got drunk and "lit a fire in the middle of the road" on the first day she arrived; that after she and the children left for Marin County in October or November, he had no in-person contact with Daughter, but spoke with her by phone.  He said he knew about the living conditions on the boat, but felt he could not intervene because "[Mother] does her own thing."  He said he was

concerned about Daughter not attending school and not having a birth certificate and "tried to help."

A contested jurisdiction hearing was held at which the court sustained the allegations of the petitions, and recognized G.L. as Daughter's biological father. The court ordered supervised visitation for Mother with both children, and supervised visitation for G.L. with Daughter.

C.    *Disposition*

In reports submitted to the court in advance of the disposition hearing, the Department noted that Mother had declined to engage with the social worker concerning her case. Mother had weekly virtual visits with the children, which were positive. Mother was also offered weekly in-person visits and attended one, which went well, but she cancelled subsequent in-person visits, advising the Department that she had traveled out of state.

In-person weekly visits between G.L. and Daughter had been planned, but G.L. determined that a monthly in-person visit would be more realistic in view of the distance he would have to travel. He later declined a monthly visit because of travel issues. Instead, G.L. had weekly video visits with Daughter once a week. The Department reported the visits were brief and positive.

The Department proposed case plans for Mother that identified three service objectives: "Stay sober and show your ability to live free from alcohol dependency"; "Consistently, appropriately and adequately parent your children"; and "Comply with psychological treatment to stabilize mental health."[5] For each objective, the plans identified a number of tasks for Mother. For example, the plans required Mother to complete a substance

_____

[5] The case plans for Daughter and Son are substantially identical with respect to Mother.

7

abuse program, participate in regular substance abuse testing, and attend 12-step meetings. Mother was to work to find stable housing for herself and the children, and develop a plan for ensuring that the children's physical, emotional, developmental, and educational needs are met. And Mother was to complete a psychological evaluation, to be followed by ongoing treatment and support as recommended. With respect to the psychological services requirement, the Department stated in its Disposition Reports, "[Mother] has made bizarre statements regarding the legal jurisdiction of the dependency case and has attempted to file legal documents in other courts. These statements and actions raise concern about possible underlying psychological or mental health issues, but [Mother's] lack of participation has made it impossible to further assess her needs. For this reason, the Department has included in the case plan that [Mother] participate in a psychological evaluation in order to help identify other possible factors, in addition to substance use, that may be impacting [her] parenting or making it difficult for her to engage in services."

The Department recommended that both children be declared dependents of the court, that Mother receive reunification services, and that N.M., who had declined to go forward with his request to be designated Daughter's presumed father, receive reunification services with respect to Son.

In February 2021, a contested disposition hearing was conducted at which the court admitted the Department's reports into evidence. G.L. withdrew his contest and submitted on disposition. His counsel reported that G.L. was "fine with" Daughter's placement and did not want to disrupt it; that he was happy with visitation as currently arranged and would like that to continue; and that he was not contesting the disposition recommendation.

8

In particular, G.L. did not contest the lack of reunification services. His counsel stated, "[I]n the future if we are able to clarify his paternity and establish that, I would ask that we be able to revisit that in the future or we can file a [Judicial Council form] JV-180 ['Request to Change Court Order']." The court responded, "Exactly."

Mother's contest was conducted by her counsel through argument. Among other things, counsel explained that Mother "objects to the jurisdiction of this Court being legitimate. She objects to the kids being placed outside of her home and asks that the children be returned to her immediately." Mother did not challenge the Department's recommendations with respect to the aspects of the case plans outlined above. Counsel stated, without more, that she had provided Mother "a copy or a written explanation of the case plan including the testing, the 12-step program, counseling," and that Mother had not responded to her about that. Counsel concluded, "So I will submit on that."

The court adopted the Department's recommendations, including the case plans. The court found that placement of the children with Mother would be detrimental, and that out of home placement was necessary and appropriate because Mother had a "long-standing, very significant alcohol problem" and there were "issues with some substandard living conditions, lack of supervision, lack of medical care and lack of addressing educational needs." In addition, the court found that G.L., identified as Daughter's biological father, "was aware of all of these things and did nothing to assist or provide the needed care."

Mother and G.L. timely appealed.

9

## DISCUSSION

### A.  *Mother's Challenge to the Case Plans*

Mother argues that the juvenile court approved case plans that are inconsistent with applicable law, and that in so doing acted without authority and therefore abused its discretion.  The Department argues that, even assuming Mother had not forfeited her claims by failing to object to the case plans at the disposition hearing, the court did not abuse its discretion, and any errors in the case plans are harmless.  We conclude that Mother has preserved her claims for appeal, but fails to show any prejudicial error by the juvenile court.

#### 1.  *Applicable Law and Standard of Review*

The case plan is "the foundation and central unifying tool in child welfare services."  (§ 16501.1, subd. (a)(1).)  The case plan is prepared by the Department to ensure "that services are provided to the child and parents . . . in order to improve conditions in the parent's home, [and] to facilitate the safe return of the child to a safe home or the permanent placement of the child."  (§ 16501.1, subd. (a)(2).)  "The case plan has several components, including identifying the reasons for the dependency (§ 16501.1, subd. (g)(3)); setting forth specific goals and describing why planned services are appropriate to meet those goals (§ 16501.1, subd. (g)(2)); and describing the services to be provided to assist in reunification (§ 16501.1, subd. (g)(10.))."  (*In re M.R.* (2020) 48 Cal.App.5th 412, 423 (*M.R.*).)  The juvenile court is required to review the case plan and determine whether it meets the requirements of section 16501.1; if the court finds that the plan does not meet the requirements, the court must order the Department to comply with them.  (Cal. Rules of Court, rule 5.690(c)(2)(A)-(B).)

"When the court orders a parent to participate in a program—such as parent education, counseling, parenting programs, etc.—the program must be 'designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300.' (§ 362, subd. (d).)  In other words, the court cannot arbitrarily order services that are 'not reasonably designed' to eliminate the behavior or circumstances that led to the court taking jurisdiction of the child.  [Citation.]" (*M.R.*, *supra*, 48 Cal.App.5th at p. 424.) This does not mean that the court is limited to the content of the sustained petition when it makes dispositional orders and approves a case plan.  To the contrary, the court may consider the evidence as a whole when it determines what dispositional orders are in the best interests of the children.  (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311 (*Briana V.*).)  A case plan must at a minimum include services designed to remedy the circumstances that led to the dependency, but when the record shows other circumstances that would interfere with reunification, it is appropriate for those circumstances to be addressed in the case plan as well.  (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1008 (*Christopher H.*).)

" 'The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly.  On appeal, this determination cannot be reversed absent a clear abuse of discretion.' " (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1071.) Therefore, we will not disturb a dispositional order " ' "unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)  " 'While the abuse of discretion standard gives the court substantial latitude, "[t]he scope of discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the]

11

action. . . .' " [Citation.] "Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion." [Citation.]' (*In re Baby Girl M.* (2006) 135 Cal.App.4th 1528, 1536.)" (*In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1382-1383.)

As a general matter, we apply a harmless error analysis in juvenile dependency proceedings. (*M.R.*, *supra*, 48 Cal.App.5th at p. 429.)

2.      *Analysis*

        a.      *Forfeiture*

We are not persuaded by the Department's argument that Mother forfeited her arguments by failing to challenge the case plans at the disposition hearing. We interpret Mother's challenge to the jurisdiction of the juvenile court, and her objection to the children being placed outside her home as incorporating an objection to the case plans.

Further, although Mother did not introduce any new evidence at the disposition hearing, and therefore effectively submitted on the Department's reports, her argument to the juvenile court made clear that she was not submitting on the Department's recommendations. Submission on the evidence does not forfeit the right to appeal the juvenile court's orders: "Only when a parent submits on a social worker's recommendation does he or she forfeit the right to contest the juvenile court's decision if it coincides with that recommendation." (*In re T.V.* (2013) 217 Cal.App.4th 126, 136.) Because Mother submitted on the reports, but not the recommendations, she has not forfeited her right to appeal the dispositional orders, which include the case plans.

12

b. *Merits*

Mother objects to aspects of the "Danger Statements," "Safety Goals," and "Service Objectives" included in the case plans. She also objects to certain requirements in the case plans that concern her participation in psychological services.

1. *"Danger Statements"*

In identifying the conditions that led to the dependency, each case plan included a "Danger Statement" that referred to Mother's use of alcohol "to the point where she passes out and leaves the children unsupervised on a boat or in other environments that may pose a risk to their safety, causing the children to be scared and anxious or to be harmed or killed," and to Mother avoiding "taking the children for routine medical and dental care, which may result in their becoming ill or having unmet medical or dental needs." Mother argues that the court erred in approving plans that included the Danger Statements (as opposed to plans that included a recitation of the allegations in the petitions), because the Danger Statements do not comport with the statutory requirement that the plan identify the "conditions cited as the basis for declaring the child a dependent of the court pursuant to Section 300." (§ 16501.1, subd. (g)(3).) The argument lacks merit.

The thrust of Mother's argument is that the Danger Statements "effectively" assert that dependency jurisdiction would be proper on the sole ground that parents had failed to take children for routine medical and dental care even without substantial evidence at the time of the jurisdictional finding that there was a substantial risk to the child of serious physical harm or illness. The Danger Statements make no such assertion, effective or otherwise. They simply identify Mother's failure to seek routine medical and dental care for her children as posing a risk to them. There was substantial

13

evidence that Mother had failed to seek such care, and the court could reasonably conclude that it was in the children's interest to receive such care. Mother herself seems to have recognized that the lack of routine care was a problem: according to the Department's detention reports, Mother said she could not get physical appointments for the children because they had no medical history. Mother fails to show any error by the juvenile court, and in any event she fails to show that she was harmed by the mere wording of the Danger Statements or the omission of a detailed recitation of the allegations in the petitions. We turn, therefore, to Mother's second argument.

2. *"Safety Goals" and Service Objectives*

In addition to the Service Objectives that we described above, each case plan included a "Safety Goal" that Mother "will always ensure that the children are cared for by a safe and sober caregiver and that all of their physical needs, including medical and dental care, as well as developmental, emotional, and educational needs are met."

Mother contends that the Safety Goals and Service Objectives "evidence an intent of the Department to unlawfully broaden its own authority, and thereby the court's authority," and to unlawfully extend the reach of the case plans "far beyond what the allegations in its petition had encompassed and therefore farther beyond what the court's jurisdictional finding had been." In particular, she challenges the Safety Goal that she ensure that all the children's physical needs, including medical and dental care, and developmental, emotional and educational needs are met; the Service Objective that she demonstrate that "she is addressing her past trauma and managing her current mental health symptoms so that she can prioritize her sobriety and meet all of [Daughter's and Son's] physical, emotional, developmental, and educational needs"; and the objective that she

14

work with the Department and others to "find stable housing for herself and the children." She further contends that in approving case plans that incorporated the Safety Goals and Service Objectives, the court acted beyond its authority by seeking to impose a particular philosophy of parenting and overriding parental lifestyle choice simply because the choice runs counter to the lifestyle of the majority.

As we have explained, the court's discretion in approving case plans extends beyond the allegations of the sustained petitions. (*Briana V.*, *supra*, 236 Cal.App.4th at p. 311; *Christopher H.*, *supra*, 50 Cal.App.4th at p. 1008.) The petitions alleged that Mother demonstrated a pattern of binge drinking and drank to the point of unconsciousness, leaving her children unsupervised, and that she made threats of physical violence in their presence, and that Mother's behavior put the children at risk of physical harm. Although the sustained allegations in the petitions did not refer to Mother's trauma, or lack of stable housing, or her ability to meet "all" of the children's needs, there was substantial evidence in the record to support the conclusion that Mother had unaddressed mental health issues and past trauma, that she lacked stable housing for herself and her children, and that she was unable to meet her children's needs. And there was substantial evidence that those circumstances led to the court declaring the children dependents, and that failure by Mother to remedy those circumstances would interfere with her ability to reunify with the children. As a result, the court could properly approve a plan that included the Safety Goals and Service Objectives at issue.

We outline the evidence here. Mother told the Department that she was attempting to heal from personal trauma and needed help with the care of her children while she did so. She attributed her trauma to her loss of

15

custody of her older children (who are not at issue in this case), which occurred seven years earlier. She recognized that she needed counseling. She said that she drank to deal with stress and would agree to counseling for trauma and alcohol treatment.

As for the need for stable housing, there was evidence that after Son's birth in 2017, Mother's housing fell through and she and the children were homeless and on the road for a time, and then moved to New Mexico. Mother had then left New Mexico and stayed briefly with G.L. before moving in with Grandmother on the boat in Marin County. The boat had no plumbing, the family used buckets to urinate and defecate, and there was a large gap in the railing that a child could fall through, as well as broken planks in the dock. While this matter was pending in juvenile court, Mother moved to Arizona. Through her attorney, she reported that she could not afford to live in Marin, but had recently made enough money to afford a place to live in Tucson.

Leaving aside Mother's failure to seek routine medical and dental care for the children, her failure to meet their physical needs was reflected in evidence that Mother left the children without supervision and that they were undernourished when they entered placement. Mother's failure to meet the children's educational needs was reflected in evidence that she failed to enroll Daughter in school after moving to California. And her failure to meet the children's developmental and emotional needs was reflected in her children's reports that she is "a drunk" and is "mean when she gets drunk"; that she becomes upset "for no reason"; that she fights with other adults in front of the children, which frightens them; that she hits and grabs one of the children's arms and pulls one of the children's hair; and that she is constantly drunk and looking at her phone while ignoring the children.

16

We fail to see how the Safety Goals and Service Objectives impose lifestyle requirements or a particular philosophy of parenting, and Mother offers no particulars to support her contentions in that regard.

To the extent Mother objects to the breadth of goals and objectives stating that she will "always" ensure that "all" the children's needs are met, we find her objections misplaced. Contrary to Mother's suggestion, we do not read the Safety Goals and Service Objectives as requiring Mother to get "straight A's" rather than simply "passing grades" in connection with the stated goals before reunifying with her children. (See *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 790 [in determining that releasing a child to custody of a parent would create a substantial risk of detriment the court must recognize that parents need not be ideal, noting that the mandate of the juvenile court is to "look[ ] for passing grades here, not straight A's"].) Nor do we read them as requiring mother to be an ideal parent. (See *id.* at p. 789 ["ideal parents" do not exist in the dependency system or anywhere else].) Absent any showing to the contrary, we presume that the juvenile court knows and will follow the law when it comes time to decide whether Mother can be reunified with her children. Except for the requirement that Mother "follow all recommendations" for ongoing treatment that result from the psychological evaluations, which we discuss below, Mother has not identified any specific responsibility or task in the case plans that could reach beyond the legitimate scope of the juvenile court's jurisdiction.

In sum, we do not agree with Mother that the juvenile court exceeded its jurisdiction in approving case plans that included the Safety Goals and Service Objectives. Further, just as Mother failed to show that she was harmed by the mere wording of the Danger Statements, she fails to show that

she was harmed by the mere wording of the Safety Goals or the identification of the Service Objectives.

### 3. *Treatment and Releases*

The case plans require Mother to complete a substance abuse assessment to identify the level of treatment required, to follow the recommendations of the assessment, enter and complete a treatment program as indicated, and sign releases to allow the Department to communicate with the program about her participation and progress. In addition, Mother must complete a psychological assessment, "follow all recommendations of the psychological assessment in terms of ongoing treatment and support for her mental health needs," and sign releases to allow the Department to communicate with her mental health providers.

As to the releases, Mother argues that the Department might take advantage of the releases to encourage providers to make recommendations that go beyond the proper scope of the case plans. This argument is speculative. In any event, it fails because it rests on two false premises. The first is Mother's incorrect assumption that the case plans must be limited to the four corners of the petitions. The second is Mother's contention, which we have rejected, that the Department has demonstrated its intent to extend the reach of the case plans beyond their permissible scope.

Relying on *M.R., supra,* 48 Cal.App.5th 412, Mother objects that because the case plans require her to "follow all recommendations of the psychological assessment in terms of ongoing treatment and support for her mental health needs" without specifying what services could be recommended and therefore without specifying how those services might be appropriate for meeting the case plans' goals, the plans "ran afoul of section 16501.1, subdivision (g)(2)." (*Id.* at p. 426.) The court's approval of a plan with such

18

overbroad language was error here, as it was in *M.R.* (*id.* at p. 429), but Mother fails to show any harm from it. As was the case in *M.R.*, the error could only cause harm "if a clinician actually invokes this language and recommends a service for which the case plan has not identified a connection to plan goals." (*Ibid.*) We are not persuaded by Mother's speculation that the Department might encourage her clinicians to recommend services beyond the legitimate scope of the case plans, nor by her apparent assumption that the clinicians would follow such recommendations if they were made. In any event, as was the case in *M.R.*, if the issue arises Mother can seek modification of the court's order under section 388.

Accordingly, we will affirm the dispositional orders, including the case plans, as they pertain to Mother.

B.      *G.L.'s Claim of Presumed Father Status*

G.L. argues that because the record shows he held Daughter out to be his child and received her into his home, the court's finding that he was a biological but not a presumed father was in error and should be reversed. The Department argues that G.L. has forfeited his claims concerning this issue and that in any event the court's ruling is supported by substantial evidence. The Department has the better argument.

1.      *Applicable Law and Standard of Review*

As relevant here, dependency law distinguishes between biological and presumed fathers. (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1208 (*T.R.*).) "A biological father is one whose paternity of the child has been established but who has not established that he qualifies as the child's presumed father." (*Id.* at p. 1209.) A presumed father is "one who 'promptly comes forward and demonstrates a full commitment to his paternal responsibilities—emotional, financial, and otherwise[.]' " (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801-

19

802.) "Only a presumed, not a mere biological, father is a 'parent' entitled to receive reunification services, and only a presumed father is entitled to custody of his child. [Citation.] In contrast, the juvenile court 'may' order reunification services for a biological father if the court determines that the services will benefit the child." (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 596.)

A presumed father must meet one or more of the criteria listed in section 7611, which establish a rebuttable presumption of paternity. (*T.R.*, *supra*, 132 Cal.App.4th at p. 1209.) A person claiming presumed father status bears the burden of proving the facts supporting that status by a preponderance of the evidence. (*Id.* at p. 1210.)

G.L. argues he is entitled to the presumption that arises when a man "receives the child into [his] home and openly holds out the child as [his] natural child." (Fam. Code § 7611, subd. (d).)

To qualify under subdivision (d) of Family Code section 7611, "a person must have a 'fully developed parental relationship' with the child. [Citation.] It is not enough to demonstrate 'only a caretaking role and/or romantic involvement with a child's parent.' [Citation.]" (*In re Alexander P.* (2016) 4 Cal.App.5th 475, 485.) "[A] father 'receives' the child into his home if he unambiguously demonstrates a parental relationship." (*W.S. v. S.T.* (2018) 20 Cal.App.5th 132, 149.) The mere physical presence of the child within the father's home does not suffice; to qualify as a presumed father under Family Code section 7611, subdivision (d), the alleged father must have " ' "demonstrated an abiding commitment to the child and the child's well-being" regardless of his relationship with the mother.' " (*Id.* at p. 145.) To determine whether a man has received a child into his home and openly held out the child as his own courts consider "such factors as whether the man

20

actively helped the mother in prenatal care; whether he paid pregnancy and birth expenses commensurate with his ability to do so; whether he promptly took legal action to obtain custody of the child; whether he sought to have his name placed on the birth certificate; whether and how long he cared for the child; whether there is unequivocal evidence that he had acknowledged the child; the number of people to whom he had acknowledged the child; whether he provided for the child after it no longer resided with him; whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and whether his care was merely incidental." (*T.R.*, *supra*, 132 Cal.App.4th at p. 1211.)

We review the juvenile court's paternity findings for substantial evidence. (*In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1650.) Therefore, we review the evidence in the light most favorable to the court's determination, and we draw all reasonable inference and resolve all conflicts in favor of the findings. (*Ibid.*)

2. *Analysis*

At the detention hearing, the court found that G.L. was Daughter's biological father, and was made aware that G.L. claimed to be Daughter's presumed father, but declined to make any finding as to Daughter's presumed father at that time. G.L.'s counsel did not raise the issue at any subsequent hearing, and G.L. failed to contest the Department's recommendations at the dispositional hearing: he explicitly declined to challenge the recommendation that he not receive reunification services; and he acknowledged that the court could revisit the issue "if we are able to clarify" his paternity. In these circumstances, G.L. has forfeited any argument that the court should have raised him to presumed father status. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221 ["party forfeits the right to

21

claim error as grounds for reversal on appeal [by failing] to raise the objection in the trial court"].)

Even if G.L. had not forfeited his position, we would not reverse because substantial evidence supports the finding that G.L. had not established that he was Daughter's presumed father. G.L. argues that there was evidence before the court to support a finding that he was Daughter's presumed father. He points to the fact that Mother and Grandmother, like him, identified him as Daughter's biological father; to his representations on form JV-505; and to Grandmother's statement that Mother and her children were living with him for a time after they returned to California from New Mexico. The argument is not persuasive, because the question before us is not whether the record might support a different conclusion from the one the trial court reached; the question before us is whether substantial evidence supports the trial court's decision. (*In re J.N.* (2021) 62 Cal.App.5th 767, 774.)

There was no evidence here that G.L. assisted in prenatal care, or that he had taken any action to obtain custody of Daughter during the first five years of her life. There was no evidence that he attempted to acquire a birth certificate for her. There was, however, evidence that G.L. did not know the date or place of Daughter's birth; that he was not present during Mother's pregnancy or at the birth; and that he had not provided care for Daughter throughout her life. There was evidence that G.L. first entered Daughter's life when she was two or three, and that although he visited her occasionally, she did not live with him, and he did not provide for her financially. There was evidence that he had little to no information about Daughter's medical or dental care, or her schooling. Although G.L. told the department he was concerned about Daughter not having a birth certificate and not attending

22

school, he presented no evidence as to what he did to address those concerns. And there was evidence that even though he knew the severity of Mother's drinking problem and the conditions on the boat where Daughter was living, he did nothing to intervene. The court could reasonably conclude that any care given by G.L. to Daughter was incidental to Mother's bringing her children with her to G.L.'s home for a brief stay in 2020. (*T.R.*, *supra*, 132 Cal.App.4th at p. 1211.)

## DISPOSITION

The challenged orders are affirmed.

_____

Miller, J.

WE CONCUR:


_____

Richman, Acting P.J.


_____

Stewart, J.


A162576, *Marin County Health and Human Services v. C.E., et al.*